[No. B087502. Second Dist., Div. Two. May 29, 1996.]

LOYOLA MARYMOUNT UNIVERSITY, Plaintiff and Respondent, v. LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

**COUNSEL**

Howard Friedman for Defendants and Appellants.

Sullivan, Workman & Dee, Charles F. Callanan and Joseph S. Dzida for Plaintiff and Respondent.

## OPINION

**NOTT, J.**—The Los Angeles Unified School District (LAUSD) appeals from a judgment in favor of Loyola Marymount University (Loyola) following a hearing on Loyola's petition for writ of mandate. (Code Civ. Proc., § 1085.) The judgment ordered the LAUSD to refund school development fees of $37,483, plus interest, paid by Loyola under protest. We reverse.

### FACTS AND PROCEDURAL HISTORY

Loyola is a nonprofit educational corporation and Catholic institution of higher learning located in the Westchester community of the City of Los Angeles. As an "educational institution of collegiate grade . . . not conducted for profit," Loyola has eminent domain power to acquire "any property necessary to carry out any of its powers or functions." (Ed. Code, § 94500.)[1] Loyola exercised its power of eminent domain and acquired vacant land, known as the Leavey campus, adjacent to its existing campus.

Originally zoned for residential use, the Leavey campus became subject to the same zoning restrictions as the main campus after its acquisition by Loyola. The Loyola campus has a special zoning designation of (Q) R4-1, and the use conditions imposed pursuant to that designation are known as the "Q" conditions. The Q conditions limit the uses of the campus to those of universities, churches and "uses permitted in the R1 zone."

Loyola applied for a permit to construct a new building to house a postgraduate business school known as the Hilton Business School and a parking structure on the Leavey campus. Loyola plans to move its existing business school to the new building, a change, Loyola declares through its vice-president for facilities management, that will result in no increase in students or faculty.

---

[1]Thus, for purposes of eminent domain, Loyola comes within the definition of quasi-public entities under Code of Civil Procedure section 1245.320, subdivision (a): "As used in [article 3, entitled 'Resolution Consenting to Eminent Domain Proceeding by Quasi-Public Entity'], 'quasi-public entity' means: [¶] (a) An educational institution of collegiate grade not conducted for profit that seeks to take property by eminent domain under Section 30051 of the Education Code." (Code Civ. Proc., § 1245.320.) Education Code section 30051 is the predecessor of Education Code section 94500. (Historical Note, 28B, pt. 2, West's Ann. Ed. Code (1989 ed.) § 94500, p. 172.)

The permit would not issue unless Loyola paid the school development fees, authorized under Government Code section 53080.[2] Loyola paid the fees under protest and then filed a petition for writ of mandamus. The trial court granted the petition, and this appeal followed.

### DISCUSSION

### 1. *Standard of Review.*

■ Decisions by school districts acting pursuant to authority granted by sections 53080 and 65995 are reviewed by ordinary mandamus, in which the court confines itself to a determination whether the agency's action has been arbitrary, capricious, or entirely lacking in evidentiary support. (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 231 [1 Cal.Rptr.2d 818], quoted with approval on other points in *Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 916-918 [16 Cal.Rptr.2d 226, 844 P.2d 545].) Because the ultimate question, whether the agency's action was arbitrary or capricious, is one of law, the trial court's statement of decision has no conclusive effect upon us. (*Shapell Industries, Inc.* v. *Governing Board, supra,* at p. 233.)

### 2. *Construction of the Business School Comes Within the Phrase "Commercial and Industrial Construction" as Used in the Applicable Statutes.*

Section 53080, subdivision (a)(1) provides: "The governing board of any school district is authorized to levy a fee, charge, dedication, or other requirement against any development project . . . for the purpose of funding the construction or reconstruction of school facilities, subject to . . . limitations set forth in [section 65995 et seq.]. This fee, charge, dedication, or other requirement may be applied to construction only as follows: [¶] (A) To new commercial and industrial construction . . . [or] [¶] (B) To new residential construction." Subdivision (a)(2) of section 53080 states, "For purposes of this section, 'development project' means any project undertaken for the purpose of development, and includes a project involving the issuance of a permit for construction or reconstruction . . . ."

Section 65995, subdivision (d) states, in pertinent part: "For purposes of Section 53080 and this chapter, 'residential, commercial, or industrial development' does not include any facility used exclusively for religious purposes that is thereby exempt from property taxation under the laws of this

---

[2]All further statutory references are to the Government Code unless otherwise stated.

state, . . . or any facility that is owned and occupied by one or more agencies of federal, state or local government. . . ."

◾ The LAUSD contends that the construction of the new business school by Loyola constitutes "commercial and industrial construction" under section 53080. Both parties cite us to the rules of statutory construction stated in *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]. ◾ These rules begin with our obligation "to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]" (*Ibid.*)

◾ We agree with the LAUSD that by employing the words "new commercial and industrial construction" as well as "new residential construction," and by defining the term "development project" as used in section 53080 as "any project undertaken for the purpose of development," the Legislature intended to include virtually all construction except that exempted by section 65995 et seq.

◾ Loyola directs us to section 53080.1, subdivision (e)(1)(A), which provides: "In the case of any commercial or industrial development, the following procedures shall also apply: [¶] (1) The school district governing board shall, in the course of making the findings required under subdivisions (a) and (b) of Section 66001,[3] do all of the following: [¶] (A) Make the findings on either an individual project basis or on the basis of categories of commercial or industrial development. Those categories *may include, but are not limited to*, the following uses: office, retail, transportation, communications and utilities, light industrial, heavy industrial, research and development, and warehouse." (Italics added.) Loyola contends that these categories

---

[3]Section 66001, subdivision (a) requires that the local agency imposing a fee as a condition of approval of a development project (1) identify the purpose of the fee, (2) identify the use to which the fee is to be put, (3) determine the reasonable relationship between the fee's use and the type of development project on which the fee is imposed, and (4) determine the reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed. Under subdivision (b), the local agency must determine a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed.

"give some insight into what the Legislature intended by 'commercial or industrial development,' and it is noteworthy that categories like 'educational' or 'university' were not included."

"Include" is "a term of enlargement rather than limitation." (*Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1101 [17 Cal.Rptr.2d 594, 847 P.2d 560], citing *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723].) It has been so interpreted by the courts of this state for almost a century. (See *Fraser* v. *Bentel* (1911) 161 Cal. 390, 394 [119 P. 509].) Loyola offers no basis upon which we can avoid this rule of construction. Therefore, we cannot read the categories, listed to include but explicitly not to limit the types of commercial and industrial development included in the statute, as evidence that the Legislature intended to exclude educational institutions such as Loyola.

 Loyola next points out that (1) section 53080.6 forbids imposition of school development fees on residential, commercial or industrial structures damaged by earthquakes or other natural disasters,[4] and (2) section 65995 sets statewide limits on the amount of fees which can be charged to residential, commercial or industrial development. Loyola argues that these specific references to commercial, industrial or residential development would be mere surplusage if, as LAUSD argues, the Legislature intended to charge school development fees to all forms of development.

Section 53080.6 clearly makes an exception for development necessitated by natural disasters. It is manifestly within the power of the Legislature to make such an exception. The fact that victims of natural disasters do not have to pay school development fees when reconstructing in no way impacts on whether the Legislature intended Loyola to pay such fees for new construction not brought about by a natural disaster.

With respect to section 65995, as stated by the court in *Grupe Development Co.* v. *Superior Court, supra,* 4 Cal.4th at page 919, ". . . section 65995 was an integral part of the Legislature's comprehensive revision of the subject of school financing in 1986. The legislation was designed, first,

---

[4]"(a) A fee, charge, dedication, or other requirement authorized under Section 53080 . . . may not be applied to the reconstruction of any residential, commercial, or industrial structure that is damaged or destroyed as a result of a disaster . . . .

"(b) The following definitions apply for the purposes of this section:

"(1) 'Disaster' means a fire, earthquake, landslide, mudslide, flood, tidal wave, or other unforeseen event that produces material damage or loss.

"(2) 'Reconstruction' means the construction of property that replaces, and is equivalent in kind to, the damaged or destroyed property." (§ 53080.6.)

to bring order out of confusion. Prior to its enactment, different school districts had used different methods for meeting their financing needs . . . . The 1986 legislation gathered all . . . financing under one umbrella and imposed statewide uniformity on the process, expressly occupying the field and preempting 'all local measures on the subject.' (§ 65995, subd. (e).)" In light of the language of section 65995 and the Supreme Court's interpretation of its purpose, we cannot hold, as Loyola asks us to do, that the fact that the section sets limits on the amount of fees somehow affects the determination of whether Loyola's building project is either commercial or industrial development.

Loyola proffers an interpretation of the school development fees legislation it states can be found in *Grupe Development Co.* v. *Superior Court, supra,* 4 Cal.4th at pages 915-918, and in *Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at pages 225-227. That interpretation, in Loyola's words, is: "Where new commercial, industrial or residential development projects attract people to an area where public school facilities are limited, the Legislature wants to spread the cost of new facilities to the developers generating the need."

We find no such holding in *Grupe,* which quotes extensively from *Shapell's* explanation of the history of the school facilities fees legislation. The history includes a discussion of the practice by local governments that began sometime in the early to mid-1970's to impose fees on residential developers to cover the costs of new school facilities made necessary by the new housing. *Shapell* stated: "Such 'school-impact fees' were generally considered to be a valid exercise of the police power under the California Constitution (Cal. Const., art. XI, § 7), so long as the local entity could demonstrate a reasonable relationship between the fee imposed and the need for increased facilities created by the development. [Citations.]" (1 Cal.App.4th at p. 226; quoted in *Grupe,* 4 Cal.4th at p. 916.) That review of practices by the local governments before the passage of the current school development fees legislation was not used by either court to interpret the current statutes.

However, the legislation itself requires that the school districts establish a relationship between the fee imposed on the development and the burden imposed on the school district by the development. Under section 53080.1, subdivision (e)(1), each school district governing board, in the course of making findings under section 66001 (see fn. 3, *ante*), must (A) make findings on either an individual project basis or on the basis of categories of commercial or industrial development; (B) conduct a study to determine the

impact of the increased number of employees anticipated to result from the commercial or industrial development upon the cost of providing school facilities within the district. That study must utilize employee generation estimates that are calculated on either an individual project or categorical basis, in accordance with subdivision (A); and (C) take into account the results of the study in making the findings under section 66001. Subdivision (e)(2) of section 53080.1 requires the governing board to provide an appeal process for those against whom fees are imposed. "The grounds for that appeal include, but are not limited to, the inaccuracy of including the project within the category pursuant to which the fee . . . is to be imposed, or that the employee generation or pupil generation factors utilized under the applicable category are inaccurate as applied to the project. The party appealing the imposition of the fee . . . shall bear the burden of establishing that the fee . . . is improper." (§ 53080.1, subd. (e)(2).)

Thus, the Legislature, anticipating that there would be specific commercial and industrial developments that would not affect local schools, suggested methods whereby the developers of those projects could challenge the application of the fees to their projects. In this case, Loyola's petition for writ of mandamus did not challenge the factual findings that the LAUSD made under sections 53080.1, subdivision (e)(1) and 66001, or the application of those findings to the construction of Loyola's new business school. The petition failed to raise the challenge even after the LAUSD, in its opposition to the writ petition, submitted two reports, dated February 1992 and November 1992, which contain those findings. Rather, at the trial court as on appeal, Loyola argued only the purpose of the legislation is not furthered by imposing the fees on its business school construction. Loyola's only evidence that the new construction will not impact the local schools is one line in the declaration of its vice president of Facilities Management: "When the Hilton Business School is completed, the existing school will be transferred to the new building with no increase in students or faculty." The declaration had no supporting documentation. We conclude that Loyola's evidence is inadequate to overcome the application of the fees. Loyola failed to meet its burden of establishing that the fee was improper.

### 3. *Loyola's Activities Are Commercial in Nature.*

The LAUSD correctly contends that Loyola's activities are commercial in that the school offers a service in exchange for money. Loyola asserts in response that section 65995 applies only to projects involving residential, industrial or commercial construction, citing the Legislative Counsel's 1987 interpretation of an earlier version of the section. We agree and proceed to Loyola's next contention.

Citing the rule of statutory interpretation that requires us to give the language of a statute "its usual, ordinary import . . . in pursuance of the legislative purpose" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d 1379, 1386-1387), Loyola contends that it is not usual or ordinary to describe a university that has acquired land for public use by the power of eminent domain as a "commercial developer." This argument, however, does not analyze the actual language of any pertinent statute. Neither section 53080, nor section 65995, nor any other statute cited by the parties requires that Loyola be found to be a commercial developer. The statutes impose the school development fees on residential, commercial or industrial development.

The question is whether Loyola's planned facility falls within the category of commercial use. For guidance we turn to *U.S.* v. *Brown University* (3d Cir. 1993) 5 F.3d 658, 666, cited to us by the LAUSD. We acknowledge that the *Brown University* court was not interpreting the statutes at issue before us, but one of the questions the court had to resolve was similar to the question presented by that case.

The *Brown University* court had to determine whether the Sherman Anti-Trust Act applied to the Massachusetts Institute of Technology, a private nonprofit institution of higher education, in a particular factual situation. To make the determination, the court had to consider whether the activity in question was commercial. The court noted that a transaction is classified as commercial "based on the nature of the conduct in light of the totality of surrounding circumstances. [¶] The exchange of money for services, even by a nonprofit organization, is a quintessential commercial transaction. [Citation.] Therefore, the payment of tuition in return for educational services constitutes commerce." (5 F.3d at p. 666.)

In this case, Loyola does not assert that it will not charge tuition to the business school students. Indeed, it makes no argument addressing the commercial nature of the business school's use, arguing only, as already noted, its own nonprofit and educational status.[5] We agree with the reasoning of *Brown University* and, applying it here, conclude that Loyola's building project falls within the commercial use category of sections 53080 and 65995.

In addition, Loyola cites the rule of statutory interpretation which requires that consideration should be given to the consequences that flow from a

[5]Loyola's subsequently raised argument that the new facility will be used exclusively for religious purposes is addressed later in this opinion.

particular interpretation where uncertainty exists regarding the meaning of a statute. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387.) Having concluded that Loyola's new business school falls within the plain meaning of the words of the statute, however, we do not find that uncertainty exists about the meaning of the statute in this case. Nevertheless, we will address Loyola's concern.

Loyola relies on specific sections of the Donahoe Higher Education Act (Ed. Code, § 66000 et seq.). These are Education Code section 66010, subdivision (b) (the phrase " 'independent institutions of higher education' " as used in the act refers to "nonpublic higher education institutions . . . that are formed as nonprofit corporations . . . ."); Education Code section 66010.1 (purpose of article 1 of the act is to "identify common educational missions shared by educational institutions in California and to differentiate more specific missions and functions between the various educational segments"); Education Code section 66010.7, subdivision (a) (the Legislature's expression of commitment to encourage and support collaboration and coordination among all segments of education); and Education Code section 66010.2.

Education Code section 66010.2 states that independent institutes of higher education, along with public higher education, share goals "designed to provide educational opportunity and success to the broadest possible range of our citizens . . . ." Thus, all are required to provide (1) access to education and the opportunity for educational success for all qualified Californians, (2) quality teaching and programs of excellence for their students, and (3) educational equity through a diverse student body and faculty as well as through educational environments in which each person has a chance to fully develop their potential.

After citing to these sections, without further argument or discussion, Loyola concludes that "under California law, private institutions like Loyola are no more commercial than state colleges and universities are." Once again, this argument and the statutes cited to support it pertain more to the nature of the institution than to the nature of the building activities. Nothing in the statutes cited by Loyola prohibits the imposition of school development fees on independent institutions of higher education. Loyola asserts that the LAUSD "can no more charge school impact fees to Loyola than they can to UCLA," and indeed, UCLA (the University of California at Los Angeles) likely would be exempt. We note, though, that as a state entity, UCLA would be exempt from the fees under section 65995, subdivision (d). The fact that the Legislature explicitly exempted state entities, as well as facilities used exclusively for religious purposes, but failed to mention

private universities or colleges for exemptions, argues against Loyola's position. As state entities, UCLA and the other state universities and colleges are treated separately in the statutes, as well as in the state Constitution. We will address the last point below.

### 4. Loyola Is Not Exempt From the Fees by the California or Federal Constitutions, or by Statute.

In response to the LAUSD's contention that imposing the fees does not violate due process or other constitutional guarantees, Loyola asserts that California has a policy of exempting nonprofit organizations and schools from state taxes, citing *John Tennant Memorial Homes, Inc.* v. *City of Pacific Grove* (1972) 27 Cal.App.3d 372, 382 [103 Cal.Rptr. 215], review denied. That case refers to article XIII, section 1c of the California Constitution, which was repealed on November 5, 1974.[6] Article XIII, section 3, subdivision (e) presently provides, as pertinent here: "The following are exempt from property taxation: [¶] (e) Buildings, land, equipment, and securities used exclusively for educational purposes by a nonprofit institution of higher education."

Loyola, without question, is a nonprofit institution of higher education, and we assume that the new building will be used exclusively for educational purposes. The only question is whether the school facilities fees are taxes on property within the meaning of California Constitution, article XIII, section 3, subdivision (e).

An ad valorem tax on real property is a general tax levy which applies a given rate to the assessed value of all taxable property with a particular taxing district to pay for general expenditures and general improvements. (*San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 162 [228 Cal.Rptr. 47, 720 P.2d 935], cert. den. 479 U.S. 1087 [94 L.Ed.2d 148, 107 S.Ct. 1291].) Though the distinction between a tax and other exactments is blurred, taking on a different meaning in different contexts, one distinction has been made repeatedly: taxes are compulsory, but development fees are imposed only if a property owner elects to develop. (See *ibid.*; *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 236 [253 Cal.Rptr. 497]; *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1504 [246 Cal.Rptr. 21]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 907 [223 Cal.Rptr. 379].) School facilities fees

---

[6] Former section 1c provided, in part: "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes . . . ."

promulgated by the Legislature under section 65970 et seq. are not ad valorem property taxes. (*Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 328 [170 Cal.Rptr. 685].)

■ The Supreme Court has held that the constitutional exemptions from taxation refer only to property taxes. (*Estate of Simpson* (1954) 43 Cal.2d 594, 597-598 [275 P.2d 467, 47 A.L.R.2d 991].) The court noted in *Estate of Simpson*, by way of example, that the fact that the Constitution grants veterans a property tax exemption of $1,000 does not provide veterans with an exemption from an excise or privilege tax under the Motor Vehicle License Fee Act. (*Id.*, at p. 598.) Similarly, private, nonprofit institutions' property tax exemption does not necessarily extend to school development fees.

Loyola cites *San Marcos Water Dist.* v. *San Marcos Unified School Dist.*, in which the Supreme Court held that publicly owned and used property that is exempt from property tax is impliedly exempt from special assessments. (42 Cal.3d at p.161, citing *Inglewood* v. *County of Los Angeles* (1929) 207 Cal. 697, 703-704 [280 P. 360].) A special assessment is a charge imposed on particular real property for an improvement of direct benefit to that property. (*San Marcos Water Dist.* v. *San Marcos Unified School Dist.*, *supra*, 42 Cal.3d at p. 162; *Regents of University of California* v. *City of Los Angeles* (1979) 100 Cal.App.3d 547, 549 [160 Cal.Rptr. 925].) *San Marcos* stated, "The rationale behind a public entity's exemption from property taxes and special assessments is to prevent one tax-supported entity from siphoning tax money from another such entity; the end result of such a process could be unnecessary administrative costs and no actual gain in tax revenues. [Citation.]" (42 Cal.3d at p. 161.)

The *San Marcos* case is not controlling here because Loyola is not a public, "tax-supported" entity, but a private, albeit nonprofit, entity. Were private universities indistinguishable from public entities for tax purposes, there would be no need to have separate subdivisions of California Constitution, article XIII, section 3 to exempt property owned by the state (subd. (a)) and property "used exclusively for educational purposes by a nonprofit institution of higher education" (subd. (e)). If the issue of special assessments were before us, we would follow the earlier case of *Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729, 747 [221 P.2d 31, 15 A.L.R.2d 1045], which held that exemptions of private property from taxation do not extend to special assessments. We find, however, that the development fees at issue here do not have the attributes of a special assessment, because the fees are not imposed for the direct benefit of the property being developed.

Rather, the purpose of the fees is to alleviate additional burdens on an already overburdened school district.

We conclude, based on the interpretations of the constitutional exemption stated in the cases cited, that the property tax exemption found in California Constitution, article XIII, section 3, subdivision (e) does not extend to school development fees.

Loyola also asserts that it is exempt under section 65995, subdivision (d), which provides: "For purposes of Section 53080 and this chapter, 'residential, commercial, or industrial development' does not include any facility used exclusively for religious purposes that is thereby exempt from property taxation under the laws of this state, any facility used exclusively as a private full-time day school as described in Section 48222 of the Education Code, or any facility that is owned and occupied by one or more agencies of the federal, state, or local government. . . ."

Loyola contends, without any supporting authority, that its facilities are used exclusively for religious purposes.[7] Section 65995 does not define the term "used exclusively for religious purposes." Therefore, "we looked elsewhere for assistance." (*Williams* v. *Superior Court* (1993) 5 Cal.4th 337, 352 [19 Cal.Rptr.2d 882, 852 P.2d 377].) "In doing so we simply applied the well-accepted principle of statutory interpretation that permits reference to a similar statute 'to guide the construction' of the statute in question." (*Ibid.*)

Pursuant to Revenue and Taxation Code section 207, the following is deemed to be "used exclusively for religious purposes": "Property owned and operated by a church and used for religious worship, preschool purposes, nursery school purposes, kindergarten purposes, school purposes of less than collegiate grade, or for purposes of both schools of collegiate and schools less than collegiate grade but excluding property used solely for purposes of schools of collegiate grade." The Hilton Business School does not fall within the statutory definition, which we use to guide us in interpreting section 65995. We hold that the business school likewise does not fall with the term as it is used in section 65995.

Again relying on section 65995, subdivision (d), Loyola argues that it qualifies for the state agency exemption because it is a "quasi-public agency

---

[7]Loyola cites only *People* ex rel. *Groman* v. *Sinai Temple* (1971) 20 Cal.App.3d 614 [99 Cal.Rptr. 603], arguing that "California courts have no difficulty giving a broad construction to the meaning of 'religious purposes.'" The *Groman* court stated that the case did "not deal with any question of taxation. The question [was] solely one of corporate power." (*Id.*, at p. 618.) *Groman* has no application to the issues raised in this case.

of the state." However, section 65995 gives a precise and limited list of exempt development. Had the Legislature intended to include nonprofit institutions of higher education, it could easily have done so. It is not a fair reading of the statute to interpret it to include within the phrase "any facility owned by agencies of federal, state or local government" facilities owned by a private, nonprofit university.

Loyola's final argument is that due process requires that fees be imposed only where there is a nexus between the state interest served by the fees and the proposed project, citing *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309]. *Dolan*, however, involved a redevelopment permit issued on condition that the owner dedicate a portion of her property for improvement of a storm drain and another portion for a pedestrian/bicycle pathway. The case involved the takings clause of the Fifth Amendment of the United States Constitution. (*Id.*, at p. __ [129 L.Ed.2d at pp. 315-316, 114 S.Ct. at p. 2316].) Although a regulation of economic interests that goes "too far" becomes a taking (*Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 168 [4 Cal.Rptr.2d 114], cert. den. 506 U.S. 866 [121 L.Ed.2d 135, 113 S.Ct. 191]), Loyola does not contend that its property has been taken for public use without just compensation, nor could it so contend. Nevertheless, Loyola argues that *Dolan*'s rule of "rough proportionality" (*id.*, at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319]), used to determine whether the taking has a reasonable relationship to the development, applies here. *Dolan* held, "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id.*, at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320].)

Prior to *Dolan*, the United States Supreme Court issued *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141], which created and applied the "essential nexus" test, and held that requiring landowners to grant a lateral easement for public access across their beachfront property as a condition for approval of a building permit was an unconstitutional taking.

In *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 874-876 [50 Cal.Rptr.2d 242, 911 P.2d 429], our Supreme Court considered whether the standards created by *Dolan* and *Nollan* apply where the landowner is not required to dedicate real property in return for a building permit but is required to pay a fee. The *Ehrlich* court concluded that the takings clause of the federal Constitution "is specially protective of property against *physical occupation* or invasion." (12 Cal.4th at p. 875, italics in original.) *Ehrlich*

continued, "[G]overnment generally has greater leeway with respect to noninvasive forms of land-use regulation, where the courts have for the most part given greater deference to its power to impose broadly applicable fees, whether in the form of taxes, assessments, user or development fees. Both *Blue Jean Equities West* v. *City and County of San Francisco, supra,* 3 Cal.App.4th 164 and *Commercial Builders* v. *Sacramento* [(9th Cir. 1991)] 941 F.2d 872, dealt with such legislatively formulated development assessments imposed on a broad class of property owners. Fees of this nature may indeed be subject to a lesser standard of judicial scrutiny than that formulated by the court in *Nollan* and *Dolan* because the heightened risk of the 'extortionate' use of the police power to exact unconstitutional conditions is not present." (*Id.,* at p. 876; see also *id.* at pp. 887-901 (conc. opn. of Mosk, J.).) The court nevertheless applied heightened scrutiny in *Ehrlich,* where the fees were imposed "neither generally nor ministerially, but on an individual and discretionary basis." (*Id.* at p. 876.)

Unlike *Ehrlich,* the present case falls within the general category of development fees. In light of *Ehrlich*'s discussion, we conclude that the heightened scrutiny standards articulated by the United States Supreme Court in takings clause cases have no application in California cases involving development fees.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to the LAUSD.

Boren, P. J., and Fukuto, J., concurred.

A petition for a rehearing was denied June 24, 1996, and respondent's petition for review by the Supreme Court was denied August 28, 1996. Mosk, J., was of the opinion that the petition should be granted.