Marshall B. KRUPP; Renate D. Krupp; and CSA Real Estate Development, LLC, a Colorado limited liability company, Petitioners,

v.

The BRECKENRIDGE SANITATION DISTRICT, a Colorado Special District; The Board of Directors of the Breckenridge Sanitation District, and Andrew Carlberg, as Manager of the Breckenridge Sanitation District, Respondents.

No. 99SC491.

Supreme Court of Colorado,
En Banc.

Feb. 26, 2001.

---

Kutak Rock LLP, Michael G. Martin, Craig N. Johnson, Denver, CO, Attorneys for Petitioners.

**1.** We granted certiorari on the following issue: Whether an impact fee levied against a development by a special district is a development exaction subject to a constitutional takings analysis

Vranesh and Raisch, LLP, Eugene J. Riordan, R. Woodruff Curran, Boulder, CO, Attorneys for Respondents.

Carolynne C. White, Denver, CO, Attorney for Amicus Curiae Colorado Municipal League.

Evan Goulding, Denver, CO, Attorney for Amicus Curiae Special District Association.

Justice HOBBS delivered the Opinion of the Court.

The Breckenridge Sanitation District (the District), a special district providing wastewater services, assesses a plant investment fee (PIF) on all building projects within the District. Petitioners Marshall and Renate Krupp challenged the PIF assessment on their new residential townhouse project, arguing, *inter alia*, that it amounted to an unconstitutional taking of property.[1] The court of appeals held that the PIF was not subject to a takings analysis. *Krupp v. Breckenridge Sanitation Dist.*, 1 P.3d 178, 181–82 (Colo.App.1999). We affirm the judgment of the court of appeals.

I.

The District is a single-purpose special district that provides wastewater collection and treatment services. In March 1996, an engineering consulting firm tendered a final report to the District that addressed existing wastewater collection and treatment demands and future requirements. This report, contained in the record of this case, identifies the District's planning and service area as comprising 23,500 acres of the Upper Blue River south from Dillon Reservoir to Hoosier Pass on the Continental Divide. The report describes this geographical area as being the focus of increasingly intense recreational use and development, as the historic mining town of Breckenridge in Summit County has been transformed into an international skiing and year-round resort destination, along with greater Summit, Eagle, and Grand counties.

under *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

The District has the powers necessary to implement state and federal regulations. The District's primary wastewater treatment plant discharges in close proximity to Dillon Reservoir, the largest water storage facility for metropolitan Denver's drinking water.[2] Dillon Reservoir also doubles as an economic and environmental resource of singular importance to Summit County. The Colorado Water Quality Control Commission has classified the Blue River waters, and the Dillon Reservoir receiving and releasing them, for all beneficial uses made in and through this basin, including aquatic life, recreational, water supply, and agricultural uses. 5 Colo. Code Regs. § 1002–33 at 9 (1999). These classifications are accompanied by water quality standards that require pollutant dischargers, like the District, to meet strict effluent limitations governing its discharge permits, which are issued and enforced by the Colorado Water Quality Control Division. *Id.; see also* § 25–8–203, 8 C.R.S. (2000) (authorizing classification of state waters); § 25–8–204, 8 C.R.S. (2000) (authorizing promulgation of water quality standards); § 25–8–501, 8 C.R.S. (2000) (authorizing discharge permits); §§ 25–8–701 to 703, 8 C.R.S. (2000) (addressing domestic wastewater treatment works). Dillon Reservoir is phosphorus-limited, which provides the significant degree of protection required to enable development in watersheds experiencing significant growth affecting standing water bodies, such as lakes and reservoirs.

As the report sets forth, the impact of human activity on water quality and quantity in this geographical area drives the District's service obligations and its revenue requirements. The Upper Blue River drainage is the subject of complex inter-governmental/private agreements and court decrees for the management and use of water rights, permitting out-of-priority diversions and exchanges paired with minimum stream flows in identified segments of the stream for protection of the environment.[3] This combination of private and public purposes assists Colorado and its citizens in placing to use, on both sides of the Continental Divide, the State's share of Colorado River Compact waters,[4] for traditional uses, such as municipal drinking water, and newly evolving uses, such as ski-area snowmaking and minimum stream flow water rights of the Colorado Water Conservation Board for preservation of the environment to a reasonable degree.[5] In this context, the treatment of wastewater for return to the Blue River is an important public purpose and the reason for the District's existence.

Accordingly, District facilities are designed to deliver high quality effluent back to the Blue River and to Dillon Reservoir. The engineering consultant reported to the District in 1996 that the existing wastewater treatment works would reach 95% capacity, 3.0 million gallons per day, within the next two to three years. Under Colorado statutes and regulations, upon reaching 95% capacity, the District is required to undertake planning for the expansion of its wastewater collection and treatment capability, so that the necessary facilities and treatment technologies will be in place to accommodate reasonably anticipated future demand for wastewater services. *See* 5 Colo.Code Regs. § 1002–61.8(7)(a)(iv) at 90 (1999).

The ability to develop land in the Upper Blue River drainage is directly and inexorably tied to the District's service function. Human uses require safe and beneficial dis-

---

2. The public sector's demand for water in the twentieth and twenty-first centuries, principally municipal water supply, has mirrored the nineteenth century's expansive demand for agricultural water. This demand has given rise, for example, to Denver's acquisition of a private water company and its pursuit of high quality mountain water, together with the water rights and storage structures critical to maintaining a dependable water supply. *See Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver,* 928 P.2d 1254, 1259 (Colo. 1996).

3. *See City of Grand Junction v. City & County of Denver,* 960 P.2d 675, 677–78 (Colo.1998).

4. *See Board of County Comm'rs v. Crystal Creek Homeowners' Ass'n,* 14 P.3d 325, 338 (Colo. 2000).

5. Colorado's tourist and recreational economy, as old as the State itself, has proven to be more enduring than the mineral discoveries that birthed the Colorado Territory. *See People v. Schafer,* 946 P.2d 938, 943–44 n. 7 (Colo.1997).

posal of human-generated pollutants. Land use authorization for development in the area therefore depends upon—and assumes—the District's financial ability to serve its customers, thereby enabling developers to complete their projects while reliably and dependably meeting all applicable health, environmental, and safety standards.

Consistent with sound and necessary financial, planning, and regulatory requirements, the users of the District's services are together answerable for the cost of bearing the present and growing load they generate. Accordingly, in connection with its services, the District assesses a number of fees, including "connection fees" for physical connections to its facilities, "monthly service fees" for use of the facilities, and "plant investment fees" (PIFs). A PIF is a one-time charge designed to defray the cost of expanding the District's infrastructure as development increases demand for the District's services. The PIF must be paid to the District before the Town of Breckenridge issues a building permit or certificate of occupancy for a new building.[6] The District assesses the PIF for a particular project by first calculating the project's peak effluent flow as the multiple of the peak flow from an average single family home in the District, measured in "single family equivalent" (SFE) units. One SFE unit contributes a maximum of 300 gallons of wastewater per day. The District has promulgated a schedule for the conversion of building projects into SFE units. Once a project is converted into SFE units, the District calculates the PIF assessment by multiplying the project's total number of SFE units by the unit PIF rate (currently $4,000 per unit).

The District's SFE conversion scale differentiates among residential units. The District uses one rate for single family residences, duplexes, and manufactured homes—unit types traditionally employed for long-term, year-round use. Another rate applies to short-term rental units such as apartments, townhouses, and condominiums. Because short-term dwellings tend to have higher peak occupancies and higher peak flows than comparably sized long-term dwellings, the SFE conversion rate for apartments, townhouses, and condominiums is significantly higher than the conversion rate for single family residences, duplexes, and manufactured homes.[7] The District's conversion schedule does not include a conversion category for triplexes; the District Manager is authorized to assign SFE units to triplexes, taking into account the legislative fee design.

The Krupps, owners of property in Summit County, sought to construct The Woods at Breckenridge, a residential townhouse complex.[8] The development plans called for twenty-five units, arranged in eight duplex and three triplex buildings. All relevant characteristics of the units (square footage, number of bedrooms and bathrooms, etc.) in triplex buildings are substantially identical to the units in the duplex buildings.

In August 1995, the District informed the Krupps that in calculating the PIF assessment for the Woods at Breckenridge project, it was using the lower SFE conversion rate for the duplexes and the higher conversion rate for the triplexes. The Krupps appealed to the District's Board of Directors (Board), arguing that since all the units—whether they were contained in the duplex or triplex buildings—were substantially the same, the lower conversion rate should have been used on all twenty-five units. The Krupps also argued that the District's PIF assessment for their project was subject to a constitutional takings analysis under *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) and

6. While the District must sign off on the issuance of building permits within the District, only the Town of Breckenridge has ultimate authority to grant or deny a building permit. The District's signoff is a representation that the District will provide wastewater treatment services to the new development.

7. For example, a single-family residence with three bedrooms and two baths would receive 1.0 SFE units, while an apartment with the same number of bedrooms and baths would receive 1.8 SFE units.

8. The Krupps' development company, CSA Real Estate Development, LLC, was an original party to this suit. CSA did not file a timely petition for certiorari, and is not a proper party to this appeal.

*Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). After a hearing, the Board decided to hire an expert in utility rate-setting to independently evaluate the District's SFE conversion schedule and unit PIF rate.

The expert report, submitted in February 1996 and contained in the record, concluded that the PIF assessment was not excessive in relation to the projected impact of the Krupps' project, and that there was no evidence that triplex units should be converted at the lower rate. In fact, the expert report noted that the use of duplexes had changed since the conversion chart was last promulgated, and that now they were more likely to be used as short-term rental property (subject to the higher SFE conversion rate) than as long-term residences. Therefore, in light of the District's short-term/long-term criteria, the District did not overcharge the Krupps for the triplexes, but instead undercharged for the duplexes.[9] Based in part on these findings, the Board affirmed the PIF assessment and the Krupps paid the PIF under protest.

The Krupps brought suit in Summit County District Court in April 1996, seeking review of the Board's action under C.R.C.P. 106(a)(4).[10] The Krupps also renewed their claim, among others, that the PIF assessment on their project was an unconstitutional taking. The trial court bifurcated the action between the Rule 106 claim and all other claims. On May 8, 1997, the trial court ruled that Rule 106 relief was not appropriate, as the Board did not exceed its jurisdiction or abuse its discretion in assessing the PIF against the Krupps. The Krupps then moved to amend their complaint to add a claim under 42 U.S.C. § 1983. The trial court denied the motion, holding that Rule 106 obligated the Krupps to bring all claims within one action and within thirty days of the Board's final decision.

Both parties filed for summary judgment on the *Nollan/Dolan* issue. The trial court noted that implicit in its Rule 106 ruling was the determination that the PIF assessment was not constitutionally defective. The trial court also held that *Nollan* and *Dolan* were inapplicable, because those cases were limited to certain land use decisions, and the PIF addresses wastewater collection and treatment, not land use. Finally, the trial court held that even if *Nollan* and *Dolan* were applicable, the District satisfied the test because the PIF is roughly proportional to the impact of the project on the District's facilities.

The court of appeals affirmed the trial court's determination. *Krupp,* 1 P.3d at 180. First, the court of appeals noted that the District has no statutory or regulatory authority to deny or condition the issuance of building permits, and therefore, could not leverage or extort fees under the threat of denying the permit. *Id.* at 181–82. Second, the court of appeals concluded, "the essence of a *Nollan/Dolan* violation is the demanding by the governmental authority of a concession, especially a dedication of an interest in real property, for its own benefit and not to offset the impact of the proposed development." *Id.* at 182. The District, by contrast, was assessing a charge that was primarily of benefit to the Krupps and directly related to their project development. Accordingly, the court of appeals found *Nollan* and *Dolan* inapplicable. *Id.*

## II.

■ We hold that the PIF is a valid, legislatively established fee that is reasonably related to the District's interest in expanding its infrastructure to account for new development, and that the District's specific PIF assessment on the Krupps' project was fairly calculated and rationally based. As such, the PIF does not fall into the narrow category of charges that are subject to the *Nollan/Dolan* takings analysis.

9. As a result of this study, the District subsequently amended its rules to include duplexes in the higher-rate category for apartments and condominiums.

10. C.R.C.P. 106(a)(4) allows review "[w]here any government body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law."

### A.

### Facilities and Services Fees

We begin by discussing the nature and characteristics of the PIF. As part of its duty to provide wastewater collection and treatment services, the District, through its Board, is expressly authorized to "fix and from time to time to increase or decrease fees, ... for services, programs, or facilities furnished by" the District. § 32–1–1001(1)(j)(I), 9 C.R.S. (2000); *see also* § 32–1–1006(1)(a)(I), 9 C.R.S. (2000) (providing authority for the District to compel owners of buildings within the District's boundaries to connect to the water and sewer lines). The legislature grants special districts and local governments the authority to set fees; this promotes the policy of having development help pay its own way. *See Board of County Comm'rs v. Bainbridge, Inc.*, 929 P.2d 691, 698 (Colo.1996); *Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver*, 928 P.2d 1254, 1268 (Colo.1996). Local governments often require various forms of development fees in order to apportion some of the capital expense burden they face to developers and new residents. *Bainbridge*, 929 P.2d at 698. The District has explicitly adopted this rationale for assessing the PIF, noting that "current customers are not expected to subsidize or pay for growth or to benefit development and/or developers." Breckenridge Sanitation District, *Financial Procedures and Policies* 1 (Jan. 1990).

In conjunction with the legislative grant of authority to set appropriate fees, the District promulgated a Single–Family Equivalent Unit Conversion Schedule, which set forth a comprehensive system for determining SFE units and converting them into PIF assessments. A PIF is assessed on every new project in the District, from residential housing to retail stores to service stations. In promulgating its schedule for assessing PIFs, the District acted in a legislative ca-

pacity. *See Bennett Bear Creek*, 928 P.2d at 1261 (holding that a district acts legislatively when it sets rates and charges for its services); *Cottrell v. City & County of Denver*, 636 P.2d 703, 710 (Colo.1981) (determining that "[r]atemaking is essentially a legislative function").

■■■ Municipal charges fall into four categories: (1) ad valorem property taxes; (2) excise taxes; (3) special assessments; and (4) service fees.[11] *See Bloom v. City of Fort Collins*, 784 P.2d 304, 309 (Colo.1989). The court of appeals concluded that the PIF was a service fee. *Krupp*, 1 P.3d at 184. We agree. A service fee is "a charge imposed on persons or property for the purpose of defraying the cost of a particular government service." *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 24 (Colo.2000); *Bloom*, 784 P.2d at 308. The PIF meets this definition: it is a one-time charge assessed on new building projects within the District for the purpose of defraying the cost of expanding the District's wastewater treatment system to accommodate new projects.

The PIF is very similar to a number of other municipal charges that we have held to be constitutionally valid service fees. *See, e.g., City of Littleton v. State*, 855 P.2d 448, 452 (Colo.1993) (storm drainage and flood management system); *Anema v. Transit Constr. Auth.*, 788 P.2d 1261, 1267 (Colo. 1990) (public transportation system); *Bloom*, 784 P.2d at 310 (street maintenance); *Zelinger v. City & County of Denver*, 724 P.2d 1356, 1359 (Colo.1986) (storm drainage system); *Loup–Miller Constr. Co. v. City & County of Denver*, 676 P.2d 1170, 1174 (Colo. 1984) (sewer system); *City of Arvada v. City & County of Denver*, 663 P.2d 611, 615 (Colo. 1983) (water system).

■■■ Because a service fee is designed to defray the cost of a particular governmental service, the amount of the fee must be rea-

---

11. We have used the terms "service fee," "special fee," and "special charge" interchangeably in our case law to denote a charge reasonably designed to meet the overall costs of the specific service for which the fee is imposed. *See, e.g., City of Littleton v. State*, 855 P.2d 448, 452 (Colo. 1993); *Bloom v. City of Fort Collins*, 784 P.2d 304, 308 (Colo.1989); *Loup–Miller Constr. Co. v. City & County of Denver*, 676 P.2d 1170, 1173 (Colo.1984). Here, we exclusively use the term "service fee" in speaking to the entire range of fees the statute authorizes the District's Board to adopt.

sonably related to the overall cost of the service. *Bloom,* 784 P.2d at 308. Mathematical exactitude is not required, however, and the particular mode adopted by the governmental entity in assessing the fee is generally a matter of legislative discretion. *Id.* Absent evidence to the contrary, we presume that the District may rationally distinguish between different types of projects in setting its rates. *See Loup–Miller,* 676 P.2d at 1174. Because the setting of rates and fees is a legislative function that involves many questions of judgment and discretion, we will not set aside the methodology chosen by an entity with ratemaking authority unless it is inherently unsound. *Bennett Bear Creek,* 928 P.2d at 1268.

Here, the District commissioned an independent expert report to evaluate its system for converting projects into SFE units and assessing PIFs. The expert report concluded: (1) multi-family units (such as apartment buildings and condominiums) are much more likely to be used as temporary rental units than are single family units; (2) multi-family units have, on average, higher per unit peak day flows than single family units; (3) the variation in selected conversion units used for residential users is therefore reasonable; (4) based on updated demographic information, duplexes are more appropriately treated as multi-family units; and (5) the current unit PIF rate of $4,000 per SFE unit falls well within the justifiable range for unit PIF rates, based on the District's combined historical investment and capital cost. Based on this and other evidence, the Board concluded that the District's rate design, and differential charges implementing these rates, was rational. The trial court agreed.

■ We agree with the trial court that the record is sufficient to establish a rational basis for the distinction between long-term and short-term residences in the District's SFE conversion schedule. We also agree that based on the evidence suggesting that the expected short-term, high-occupancy use of the triplex units is typical of the multi-family unit conversion category, the District had a rational basis for assessing triplexes in the higher, multi-family category. Given the evidence that even *duplexes* are more appro-

priately categorized as short-term, high-occupancy units, we reject the Krupps' contention that in assessing the PIF on their particular project, the District should have converted both the duplexes and triplexes using the lower SFE rate.

■ The District Manager calculated the specific PIF assessment on the Krupps' project by utilizing the publicly promulgated conversion schedule. There is no evidence that, in performing this task, the District Manager arbitrarily ignored the PIF's legislatively established design or miscalculated the assessment. While the SFE conversion schedule did not provide a specific conversion rate for triplexes, the District explicitly authorized the District Manager to make such a determination. *See* Breckenridge Sanitation District, *Rules and Regulations* 9–7 (Apr. 1988). Such authorization is permissible, as long as there are sufficient statutory and administrative safeguards to insure that administrative action will be rational and consistent, and that subsequent judicial review of the action, if necessary, will be available and effective. *See Cottrell,* 636 P.2d at 709; *see also Fremont RE–1 Sch. Dist. v. Jacobs,* 737 P.2d 816, 819 (Colo.1987) (noting that the modern trend for courts is to allow greater freedom of discretion, within the scope of their authority, to administrative officials). The District Manager, exercising properly authorized direction, selected a conversion rate for the triplexes that was supported by the evidence as being reasonable and consistent.

We conclude that the PIF is established by legislative authority, and is reasonably related to the specific government service of providing wastewater collection and treatment to new developments within the District. It rationally differentiates between different classes of buildings based upon anticipated peak wastewater flows per unit. Furthermore, the District Manager validly calculated the Krupps' specific PIF assessment according to a publicly promulgated conversion framework.

■ Nevertheless, the Krupps maintain that because payment of the PIF is a condition of development, the District's assess-

ment of the PIF against their development constitutes a regulatory taking. We now turn to that question.

## B.

### Scope and Limitations of *Nollan* and *Dolan*

■ The Fifth Amendment to the United States Constitution provides, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. Just compensation for a taking of private property was made applicable to the States through the Fourteenth Amendment, *see Chicago, B. & Q. R.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585–86, 41 L.Ed. 979, 985 (1897), and is expressly provided for in the Colorado Constitution. Colo. Const. art. II, § 15; *Fowler Irrevocable Trust 1992– 1 v. City of Boulder,* 17 P.3d 797, 802 (Colo. 2001). The Takings Clause assures that the government may not force "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan,* 512 U.S. at 384, 114 S.Ct. at 2316, 129 L.Ed.2 at 316 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960)).

[12, 13] A taking unquestionably occurs when an entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property. *See Fowler,* 17 P.3d at 801; *City of Northglenn v. Grynberg,* 846 P.2d 175, 178 (Colo.1993). There is no taking, however, where the government implements a land use regulation that "substantially advance[s] legitimate state interests" and does not "den[y] an owner economically viable use of his land." *Nollan,* 483 U.S. at 834, 107 S.Ct. 3147, 97 L.Ed.2d at 687 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106, 112 (1980)).

■ In between these scenarios lie development exactions, in which the government requires a landowner to forfeit part of his or her property for public use as a condition of development. While not *per se* takings, development exactions will be deemed

takings requiring just compensation unless they satisfy a two part test: (1) there must be an "essential nexus" between the legitimate government interest and the exaction demanded, *Dolan,* 512 U.S. at 386, 114 S.Ct. 2317, 129 L.Ed.2d at 317; *Nollan,* 483 U.S. at 837, 107 S.Ct. 3149, 97 L.Ed.2d at 689; and (2) there must be "rough proportionality" between the governmental interest and the required dedication. *Dolan,* 512 U.S. at 391, 114 S.Ct. 2319, 129 L.Ed.2d at 320. "No precise mathematical calculation is required" for the rough proportionality test, but the governmental entity "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.*

The Krupps argue that the PIF assessment on their project is a development exaction subject to the *Nollan/Dolan* analysis. They further maintain that because there was no individualized determination of the impact of their development, the PIF violates the "rough proportionality" prong of the *Nollan/Dolan* test. We disagree. Application of the *Nollan/Dolan* test has been limited to the narrow set of cases where a permitting authority, through a specific, discretionary adjudicative determination, conditions continued development on the exaction of private property for public use.[12] The service fee at issue is neither the result of a discretionary adjudicative decision of this type nor an exaction of property; it is a payment for services necessary to enable development of the project and to comply with responsibilities of those who generate pollutants.

### 1. Legislative v. Adjudicative Determinations

Both *Nollan* and *Dolan* concerned discretionary adjudicative determinations specific to one landowner and one parcel of land, and involved a demand for the dedication of a portion of the land for public use. In *Nollan,* the California Coastal Commission conditioned a building permit on the landowner granting an easement for public access to the

---

**12.** *See* Greg Clifton, *Recent Developments in Reg-* *ulatory Takings,* 28 Colo. Law., Nov. 1999, at 83.

beach behind the landowner's property. *See* 483 U.S. at 828, 107 S.Ct. 3144, 97 L.Ed.2d at 683. Likewise, in *Dolan*, the city made an adjudicative decision to condition the landowner's application for a building permit on an individual parcel of land. *See* 512 U.S. at 391 n. 8, 114 S.Ct. 2320, 129 L.Ed.2d at 320. The Court distinguished typical land use regulations from the type of pointed exaction demanded in *Dolan*, noting that "[t]he sort of land use regulations [that have been sustained against constitutional challenge] involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel." *Id.* at 385, 114 S.Ct. 2316, 129 L.Ed.2d at 316

Colorado's regulatory takings statute has codified the *Nollan/Dolan* test, and with it, the distinction between legislative and adjudicative determinations. *See* § 29–20–203(1), 9 C.R.S. (2000). By its very language, the statute limits the *Nollan/Dolan* test to charges that are "determined on an individual and discretionary basis." *Id.* The statute explicitly declines to apply the test to "any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government." *Id.*[13] While a party may petition for review of a legislatively based assessment that results from arbitrary or illegal administrative action under C.R.C.P. 106(a)(4), this form of review is not an "individual or discretionary" adjudication as contemplated in section 29–20–203(1).

Other jurisdictions have also distinguished between generally applicable, legislatively formulated fees and adjudicatively imposed development exactions. The California Supreme Court, for example, noted that:

[I]t is not at all clear that the rationale (and the heightened standard of scrutiny) of *Nollan* and *Dolan* applies to cases in which the exaction takes the form of a *generally* applicable development fee or assessment—cases in which the courts have deferred to legislative and political processes to formulate "public program[s]

**13.** The General Assembly has declared that special districts are political subdivisions and local governments of the State of Colorado. *See* § 32–

adjusting the benefits and burdens of economic life to promote the common good."

*Ehrlich v. City of Culver City*, 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429, 446 (1996) (emphasis in original) (citations omitted); *see also Parking Ass'n of Georgia, Inc. v. City of Atlanta*, 264 Ga. 764, 450 S.E.2d 200, 203 (1994). One critical difference between a legislatively based fee and a specific, discretionary adjudicative determination is that the risk of leveraging or extortion on the part of the government is virtually nonexistent in a fee system. When a governmental entity assesses a generally applicable, legislatively based development fee, all similarly situated landowners are subject to the same fee schedule, and a specific landowner cannot be singled out for extraordinary concessions as a condition of development. *See Home Builders Ass'n of Cent. Arizona v. City of Scottsdale*, 187 Ariz. 479, 930 P.2d 993, 1000 (1997); *Loyola Marymount Univ. v. Los Angeles Unified Sch. Dist.*, 45 Cal.App.4th 1256, 53 Cal.Rptr.2d 424, 434 (1996).

Here, the District created a generally applicable service fee on all new development within the District. The General Assembly authorized the fee and the District assessed it under the terms of a publicly promulgated conversion schedule. Neither the promulgation of the conversion schedule, nor the calculation of the Krupps' PIF assessment by the assigned administrative official, constituted a discretionary adjudicative activity. *See Cottrell*, 636 P.2d at 710 (noting that in setting out rate schedules for future application, a governmental entity engages in the "balancing of many questions of judgment and discretion" that is the mark of a legislative activity). Unlike the landowners in *Nollan* and *Dolan*, whose conditions for development were determined on an individualized adjudicative basis, the Krupps were charged a fee that was assessed on all new development within the District. The PIF assessment on the Krupps' development, then, is different from the exactions subject to *Nollan* and *Dolan*, both in its creation and in its reach.

1–1601, 9 C.R.S. (2000); *see also Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 39 (Colo. 1995).

2. Property Exactions v. Monetary Exactions

The PIF also differs from traditional *Nollan/Dolan* exactions in that it is purely a monetary assessment rather than a dedication of real property for public use. Notwithstanding this difference, the Krupps argue that the PIF assessment is an exaction of the kind contemplated in *Nollan* and *Dolan*. They assert that for the purpose of a takings analysis, there is no difference between exactions that invoke the dedication of land and those that do not. We do not agree. Recent pronouncements by the United States Supreme Court strongly indicate that the *Nollan/Dolan* test is limited to exactions involving the dedication of property.

The Supreme Court recently clarified the narrow scope of the *Nollan/Dolan* test in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). In *City of Monterey*, the city repeatedly rejected proposals to develop a property, each time adding new requirements for the approval of the development plan. The Supreme Court rejected the applicability of *Nollan* and *Dolan* to the case, noting that "we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the *dedication of property to public use*." *Id.* at 702, 119 S.Ct. 1635, 143 L.Ed.2d at 900 (emphasis added). The plain language of *City of Monterey* suggests that a *Nollan/Dolan* analysis is appropriate in the narrow circumstance where the government conditions development on the forfeiture of private property for public use.

The *City of Monterey* Court made explicit the conclusion that other jurisdictions had been reaching for years. In *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1578 (10th Cir.1995), the Tenth Circuit Court of Appeals concluded that *Nollan* and *Dolan* "are limited to the context of development exactions where there is a physical taking or its equivalent." The *Clajon* court further explained:

Nollan and *Dolan* essentially view the conditioning of a permit based on the transfer of a property interest—i.e., an easement— as tantamount to a physical occupation of one's land.... Thus, we believe that *Nol-*

*lan* and *Dolan* are best understood as extending the analysis of complete physical occupation cases to those situations in which the government achieves the same end (i.e., the possession of one's physical property) through a conditional permitting procedure.

*Id.*

Other state courts have reached similar conclusions about the limited scope of *Nollan* and *Dolan*. In *City of Scottsdale*, 930 P.2d at 1000, the city imposed a water resources development fee on all new realty developments. In upholding the constitutionality of the fee, the Arizona Supreme Court distinguished *Dolan*, noting that the property exaction there was "a particularly invasive form of land regulation [justifying] increased judicial protection for the landowner," while the city's water resources development fee was "a considerably more benign form of regulation." Similarly, in *McCarthy v. City of Leawood*, 257 Kan. 566, 894 P.2d 836 (1995), the Kansas Supreme Court refused to apply a *Dolan* analysis where building permits were conditioned on payment of impact fees. The court noted that "[t]he majority [in *Dolan*] concluded that the conditions which required the dedication of land constituted an uncompensated taking. There is nothing in the [*Dolan* ] opinion, however, which would apply the same conclusion to Leawood's conditioning certain land uses on the payment of a fee." *Id.* at 845.

There was no physical taking here. The PIF is not an exaction of land; rather, it is a generally applicable service fee designed to defray the costs of expanding the wastewater treatment system directly caused by new development. Because *Nollan, Dolan,* and their progeny applied heightened scrutiny only where the government demanded real property as a condition of development, we find that they are not applicable to a general development fee.

The Krupps urge that *City of Monterey* does not close the door on application of the *Nollan/Dolan* test to monetary exactions. They argue that the *City of Monterey* Court was never presented with the specific question of monetary exactions, since the actions

of the city involved complete denial of the landowner's proposed development, not a demand for money. Furthermore, the Krupps cite cases in which purely monetary exactions were subjected to a *Nollan/Dolan* analysis. *See Ehrlich,* 50 Cal.Rptr.2d 242, 911 P.2d at 439 (applying *Nollan* and *Dolan* where the city conditioned a permit to build tennis courts on a payment of $280,000, to be used for additional public recreational facilities); *Homebuilders Ass'n of Dayton v. City of Beavercreek,* 89 Ohio St.3d 121, 729 N.E.2d 349, 356 (2000) (citing *Nollan* and *Dolan* for its own test for a development impact fee); *Clark v. City of Albany,* 137 Or.App. 293, 904 P.2d 185, 189 (1995) (applying *Dolan* where permit conditions required the landowner to expend money on improvements for the public benefit).

We recognize that the context of the Supreme Court's pronouncement in *City of Monterey* leaves open the possibility that a very narrow class of purely monetary exactions may be subject to heightened scrutiny under the *Nollan/Dolan* test. The PIF, however, does not fall into this narrow class. In both *Ehrlich* and *Clark,* the charges subjected to the *Nollan/Dolan* analysis were not generally applicable fees, but rather exactions stemming from adjudications particular to the landowner and parcel. The court in *City of Beavercreek* discussed *Nollan* and *Dolan* in the context of service fees, but ultimately articulated a "reasonable relationship" test. *See City of Beavercreek,* 729

N.E.2d at 356. We can find no indications from the Supreme Court or in other caselaw to support the application of heightened scrutiny to generally applicable service fees such as the PIF.

### Conclusion

We therefore conclude that the PIF is a legislatively created, generally applicable service fee, and is not subject to a takings analysis under *Nollan* and *Dolan.* Each PIF assessment is calculated by publicly promulgated standards that are applicable to all new developments within the District. The PIF is not imposed adjudicatively in the *Nollan/Dolan* sense, and is not an assessment unique to the Krupps. Moreover, the PIF is neither a land use regulation nor an exaction of property as a condition of development. Consequently, it does not fall into the relatively narrow category of development exactions addressed by *Nollan* and *Dolan.*

### III.

Accordingly, we affirm the judgment of the court of appeals.