135 Cal.Rptr.2d 815 (2003)
109 Cal.App.4th 1179
CITY OF MARINA et al. Plaintiffs and Respondents,
v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, Defendant and Appellant.
No. H023158.
Court of Appeal, Sixth District.
June 17, 2003.
As Modified on Denial of Rehearing July 17, 2003.
Review Granted October 1, 2003.
*817 Horvitz & Levy, John A. Taylor, Jr., Patricia Lofton, Encino, Miller, Starr & Regalia, Basil S. Shiber, Menlo Park, Christian M. Carrigan, Walnut Creek, for Appellant: Board of Trustees of the California State University.
Lombardo & Gilles, Sheri L. Damon, Law Offices of Robert Wellington, Kenneth D. Buchert, Monterey, Law Offices of Mary L. Hudson, Mary L. Hudson, for the Respondents: City of Marina et al.
*816 RUSHING, P.J.
Fort Ord, once the largest military base on the West Coast of the United States closed in the early 1990's creating economic difficulty for adjacent cities. In 1994 the Legislature passed the Fort Ord Reuse Authority Act, called "the FORA Act" to finance and construct public facilities and uses on the old army base. The members of FORA are, among others, the County of Monterey and the cities of Monterey, Salinas, Carmel, Marina and Pacific Grove. Off campus traffic and fire improvements have been sought by way of an administrative writ proceeding under the California Environmental Quality Act (CEQA)[1] on the Board of Trustees of the California State University (the Trustees) for its campus at Monterey (the University). The Trustees have refused to pay for those services claiming to do so would violate its duties under the Constitution and would constitute a gift of public funds. It has agreed to pay for statutorily authorized, sewage and water facilities, but not anything else.
In 1986, the California Supreme Court decided San Marcos Water Dist. v. San Marcos Unified School Dist. (1986) 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935 (Saw, Marcos). There the water district imposed a "`sewer capacity right fees'" on the school district. (Id. at p. 157, 228 Cal.Rptr. 47, 720 P.2d 935.) The court found that the sewage charges for capital improvements in question could not be assessed against the school district. Indeed, the Supreme Court found generally that one tax-supported entity may not siphon revenues from another tax-supported entity. Disputes concerning capital improvements necessary in the surrounding area to a public university campus, the nature of this case, have also occurred, and with the same result. (See, e.g., Regents of University of California v. City of Los Angeles (1979) 100 Cal.App.3d 547, 160 Cal.Rptr. 925 (hereafter Regents I); Regents of University of California v. City of Los Angeles (1983) 148 Cal.App.3d 451,196 Cal.Rptr. 14 (hereafter Regents II).)
In 1988, the Legislature accepted the invitation extended to it by the concurring opinion of Justice Grodin in San Marcos, supra, 42 Cal.3d at page 169, 228 Cal.Rptr. 47, 720 P.2d 935 to "establish a different rule" and enacted Government Code section 54999 et seq., in which the holding in San Marcos was reiterated and an exception was then created for public utility facilities defined as "a facility for the provision of water, light, heat, communications, power, or garbage service, for flood control, drainage or sanitary purposes, or for sewage collection, treatment, or disposal." (Gov.Code § 54999.1, subd. (d).) To make it plain, the Legislature allowed for those sewage and water charges to be assessed but not charges for capital improvements for traffic or fire safety, as relevant here. Both defendant and plaintiff agree that we are bound by Government Code section 54999.1.
*818 The imposition of assessments for sewage and water improvements is not at issue in this case. There can be no question that the university is subject to those fees because at Government Code section 54999.3 the Legislature made it so.
CEQA requires that all of the negative impacts of a particular project be included in an environmental impact report (EIR). CEQA does not ultimately require that the environmental impacts be mitigated as long as they are identified and certain findings are made regarding the feasibility of mitigating the impacts and the desirability of the project. There are some exceptions in other acts and statutes irrelevant here having to do with such effects as toxic waste and endangered species, but CEQA by its terms permits an agency, once it has considered an environmental effect, to go forward with the project if it adopts certain findings.
The Trustees made such findings in its EIR with respect to traffic and circulation as well as fire services. The Trustees found that to mitigate these impacts to a level of insignificance would require the cities through FORA to implement certain measures, and that FORA was the agency with the responsibility and jurisdiction to do so. Specifically the Trustees found that the University could not under the law pay for those services because they were not listed under the legislative response to San Marcos in Government Code section 54999.
The Trustees are correct, and for that reason we reverse the judgment of the court below which ordered that the University participate in such expenses.

BACKGROUND
In 1991, the United States government announced the planned closure of the Fort Ord military base, a military facility occupying approximately 44 square miles (28,000 acres) of land along the Pacific Ocean in Monterey County. The former base includes lands within the jurisdictions of the cities of Marina and Seaside, and in unincorporated Monterey County. In response to the closure announcement, local governments organized the Fort Ord Reuse Group to begin planning an initial reuse plan.
In 1994, the state Legislature enacted the FORA Act. (Gov.Code, § 67650 et seq.) Pursuant to the legislation, FORA was established in May 1994 to "plan for, finance, and manage the transition of the property known as Fort Ord from military to civilian use." (Gov.Code, § 67658.) The Legislature specifically declared that "the powers and duties granted to [FORA] by this title shall prevail over those of any local entity, including any city or county, whether formed under the general laws of the State of California or pursuant to a charter, and any joint powers authority." (Gov.Code, § 67657, subd. (c).)
The FORA Act also explicitly states: "The applicability of any capital facilities fees imposed under this title to public educational agencies shall be subject to the provisions of Chapter 13.7 (commencing with Section 54999) of Part 1 of Division 2 of Title 5." (Gov.Code, § 67685.) These sections of the Government Code are the sections that govern "imposition of a capital facilities fee on any school district, ... the California State University, the University of California, or state agency...." (Gov.Code, § 54999.3.)
FORA is governed by a board of 13 members appointed by Monterey County and eight cities. (Gov.Code, § 67660.) The board was mandated to "prepare, adopt, review, revise from time to time, and maintain a plan for the future use and development" of the former Fort Ord property. (Gov.Code, § 67675, subd. (a).) "The adopted plan shall be the official local plan for the reuse of the base for all public purposes, ... and for purposes of planning, *819 design, and funding by all state agencies." (Ibid.) The plan is mandated to include a land use plan, a transportation plan, a conservation plan, a recreation plan, and a capital improvement program. (Gov.Code, § 67675, subd. (c).) The board is authorized to finance the plans by seeking state and federal grants and loans, levying assessments or special taxes, and issuing bonds. (Gov.Code, § 67679, subds.(c) & (d).)
Also in May 1994, the Trustees agreed to establish a new campus, the University, on approximately 1,350 acres of the former Fort Ord property. The property conveyed to the Trustees included residential units, residence halls, other facilities, and open space. The Trustees adopted an EIR in May 1994 to address the potential effects of the property conveyance and transfer, establishment of the University campus, and initial renovations of buildings. The first parcels of land were transferred to the University in June 1994. The campus opened in August 1995 with 654 students. The Trustees have projected that the University campus will need to grow to accommodate a total enrollment of 25,000 full time enrolled (FTE) students by the year 2030.[2] The FORA Act recognizes the Trustees as the sovereign redevelopment authority for the University campus. (Gov.Code, § 67678, subd. (e).)
In June 1997, FORA adopted a Base Reuse Plan that projected construction of base-wide improvements for traffic, fire protection, water and sewage. FORA's plan proposed a financing program that required "fair share" funding from each of the FORA jurisdictions that contribute to the impact and identified the inclusion of The University in the program.
In February 1998, the University completed its campus master plan (CMP), which sets forth the physical planning parameters that are to guide the University's physical growth and development. The CMP provides for a mix of land use plans, including educational, outdoor recreational, residential, and open space, with development in four phases ending in 2030. The University also developed an EIR in accordance with CEQA, with the Trustees as the lead agency and the University as the local implementing agency. (See, Ed. Code, § 66606.) The EIR noted that significant off-campus traffic, water and sewage, and fire safety protection impacts would occur and identified a variety of feasible mitigation measures to reduce the impacts to less than significant. It also noted that some of the impacts could only be reduced to less than significant if regional improvements are implemented by another agency, FORA; otherwise the impacts would remain unavoidably significant as implementation of certain mitigation measures is beyond the responsibility and authority of the University. The EIR found that these impacts could only be avoided by abandoning the project (the No Project Alternative),[3] but further found that this alternative was not consistent with the goals of the state and the master plan to establish the university and foster economic vitality within the area. The University anticipated paying only for proportional capital facility fees required for provision of utilities, flood control, drainage, sanitation, and wastewater collection, treatment and disposal, pursuant to Government Code section 54999.1, but anticipated no other contribution to infrastructure costs.
The University found that there were overriding social, cultural, and economic reasons for approving the project notwithstanding the disclosure of significant impacts in the EIR. Its "Statement of *820 Overriding Considerations" was tailored specifically to CEQA.[4] The "overriding considerations" included the following: (1) the projected demand for postsecondary education; (2) the need for higher education of underrepresented groups; (3) the economic revitalization of a region severely impacted by military base closure; (4) the provision of facilities for nontraditional academic programs; (5) the creation of job opportunities for faculty, staff and those in support activities; and (6) the provision of community facilities and programs, such as a performing arts center, a cultural center and an executive learning center.
On or about November 6, 1998, the City of Marina filed a petition for writ of mandate challenging the University's certification of the EIR and its approval of the CMP as being in violation of CEQA. FORA filed a similar petition three days later. FORA alleged that the EIR failed to "adequately recognize the FORA allocation of fair-share costs of [the University's] long-term impact on the infrastructure, or otherwise financially plan for the impacts and/or mitigation measures to minimize the impact on the local regional resources."
The Trustees demurred to FORA's petition and filed a motion to strike the city's petition. The record does not reveal whether the demurrer and the motion to strike were ever heard or, if they were, what the disposition was as to those proceedings.
On or about April 16, 1999, the City of Marina and FORA filed first amended writ petitions that once again challenged the certification of the EIR and the approval of the CMP. At some point, the proceedings on the writ petitions were consolidated. The Trustees answered FORA's first amended petition. It is not clear from the record whether they also answered the city's petition.
After further briefing and a hearing, the Superior Court issued a preemptory writ ordering the Trustees to either vacate the resolution approving the CMP or, in the alternative, adopt findings that would "provide for mitigation of significant adverse environmental impacts off-site" "through either or both of "(i) adoption and implementation of findings which commit the TRUSTEES to provide funding for public capital facilities necessary to mitigate the CMP impacts, and/or (ii) adoption and implementation of other measures sufficient to mitigate the impacts." The Trustees were specifically ordered to set aside the adopted statement of overriding considerations. In its statement of decision the court stated, "[R]ead together, the statutes creating FORA and CEQA reflect a legislative intent for [the Trustees] to participate in the funding of any public capital facilities caused by (i.e., with a nexus to) the CMP for [the University], limited to *821 it's proportionate share and further limited only by the constraints of Gov.Code Chapter 13.7 with respect to certain specific types of utility fees.... [The Trustees'] responsibility is to fund its proportionate share consistent with its phased development into a fund earmarked only for the mitigation of those impacts. This is a responsibility no greater or less than that imposed by CEQA on any other project proponent.... [The Trustees'] responsibility for funding of mitigation measures relates only to those impacts remaining after other mitigation. The CMP impacts for which [the Trustees] bears mitigation responsibilities are those identified in the CMP. FORA's responsibility is to determine and allocate responsibility for cumulative impacts of Fort Ord's reuse, identify mitigation and corresponding costs, and allocate proportional shares of those costs among contributors to the impacts, including [the Trustees], subject to notice and an opportunity for those affected to comment or object."

DISCUSSION

1. Standard of Review

This court said in Schaeffer Land Trust v. San Jose City Council (1989) 215 Cal. App.3d 612, 263 Cal.Rptr. 813, "In a case where the question is the adequacy of an EIR, the court's function is to uphold the decision unless there has been an abuse of discretion (Code Civ. Proc., § 1094.5, subd. (b)) or the decision is not supported by substantial evidence ([Pub. Resources Code,] § 21168; Code Civ. Proc., § 1094.5, subd. (b))." (Id. at p. 622, 263 Cal.Rptr. 813.) We went on to note that this court will review the administrative record de novo: "We note that our duties are identical to those of the trial court as we occupy, in essence, identical positions exercising the appellate function of determining whether the administrative record is free from legal error. Thus, we conduct our own independent review and the conclusions of the superior court and its disposition of the issues in this case are not conclusive on appeal. [Citations.]" (Ibid.) This remains the standard of review. (Gentry v. City of Murrieta (1995) 36 Cal. App.4th 1359, 1375-1376, 43 Cal.Rptr.2d 170; Federation of Hillside & Canyon Associations v. City of Los Angeles (2000) 83 Cal.App.4th 1252, 1259, 100 Cal.Rptr.2d 301.)

2. CEQA Does Not Require The Environmental Impacts Be Mitigated if That is Infeasible

Respondents and the court below implied a substantive requirement of CEQA that the University mitigate environmental impacts. CEQA does not ultimately require such a result.
The procedure of creating the EIR document under CEQA is directed primarily at ensuring that decision-makers and the public have all of the relevant information concerning negative environmental impacts, and make a conscious and open decision whether to proceed with the project. (Pub. Resources Code, § 21081.) "The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.]" (Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 134, 65 Cal.Rptr.2d 580, 939 P.2d 1280; Citizens for Quality Growth v. City of Mt. Shasta (1988) 198 Cal.App.3d 433, 440-441, 243 Cal.Rptr. 727; Resource Defense Fund v. Local Agency Formation Com. (1987) 191 Cal. App.3d 886, 896, 236 Cal.Rptr. 794.) "Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures. [Citation.]" (Mountain Lion Foundation v. Fish & Game Com., *822 supra, 16 Cal.4th at p. 134, 65 Cal.Rptr.2d 580, 939 P.2d 1280.)
This does not mean that environmental effects must be mitigated, as respondents and the court's decision below imply. In Kenneth Mebane Ranches v. Superior Court (1992) 10 Cal.App.4th 276, at page 291, 12 Cal.Rptr.2d 562, the court said: "CEQA also gives public agencies the authority to approve a project notwithstanding its environmental impacts, if the agency determines it is not feasible to lessen or avoid the significant effects (Pub. Resources Code, § 21002; Cal.Code Regs., tit. 14, § 15043, subd. (a)), and if specifically identified benefits of the project outweigh the unavoidable, significant environmental impacts. (Pub. Resources Code, § 21002.1, subd. (c); Cal.Code Regs., tit. 14, § 15043, subd. (b); [citation].)"
This court, in Towards Responsibility in Planning v. City Council (1988) 200 Cal.App.3d 671, 246 Cal.Rptr. 317, explained that agencies may approve a project in spite of identified adverse environmental impacts, if such agencies "explain, in written findings, that mitigation measures or environmentally sounder alternatives were not feasible, and that overriding considerations justify the project's approval. (Pub. Resources Code, § 21081; Guidelines[(Cal.Code Regs., tit. 14,)] §§ 15091, 15093.) The findings must be accompanied by `a brief explanation of the rationale for each' (Guidelines, § 15091), and the statement of overriding considerations must be based on information contained in the record (Guidelines, § 15093, subd. (a))." (Id. at p. 683, 246 Cal.Rptr. 317.) It is sufficient if the resolutions of the public agency "identify certain adverse environmental effects and prospective benefits of the project" and "reflect the judgment that the social, economic and environmental benefits of the project outweigh its significant environmental risks." (San Francisco Ecology Center v. City and County of San Francisco (1975) 48 Cal. App.3d 584, 596, 122 Cal.Rptr. 100.) If "the resolutions adequately expose the agency's mode of analysis, they must be sustained if supported by substantial evidence." (Ibid.)
There is no dispute that the CMP at issue identified traffic, fire, water and sewage impacts that would not be fully mitigated by the University. The only issue under CEQA would concern whether the University correctly determined that it was "not feasible to lessen or avoid the significant effects [citation], and if specifically identified benefits of the project outweigh the unavoidable, significant environmental impacts. [Citations.]" (Kenneth Mebane Ranches v. Superior Court, supra, 10 Cal.App.4th at p. 291, 12 Cal.Rptr.2d 562.) We thus will analyze specifically the findings at issue in the following section.

3. The Record and Statutory Authority Support the Analysis Reflected in the Trustees' Findings that Assuring Mitigation of Environmental Impacts Was Infeasible

The Trustees in the findings at issue, make a distinction between those "utilities" governed by Government Code Section 54999, subd. (d), for which it may be assessed proportional costs, and items such as traffic and fire safety improvements which the Trustees do not consider to be such statutorily defined utilities. The Trustees made the following finding with respect to water quality, and similar findings regarding water supply and public utilities, all of which the Trustees have conceded are utilities subject to Government Code section 54999:
"Finding: The Board of Trustees finds that specific measures to mitigate this impact to a level of insignificance is to implement the planned regional FORA drainage improvements, ... as identified in the FORA Reuse Plan and accompanying *823 documents. [The University] will contribute fees as mandated by applicable provisions of Government Code Section 5-999 to mitigate its share of the impact. Implementation of the planned regional improvements is FORA's responsibility. It can and should implement these measures. They are, in fact, included in FORA's Reuse Plan. Drainage is presently adequate .... As noted, there are current disputes regarding implementation of these measures; any remaining unavoidable impacts are acceptable as a worst case because of the reasons specified in the Statement of Overriding Considerations." (Italics added.)
With respect to the finding for water supply, the finding of the Trustees is more pointed, noting as follows: "[The Trustees] finds that implementation of the planned regional improvements are within the responsibility of FORA, and the FORA can and should implement these measures either directly or through a FORA designated utility. While FORA and local agencies have demanded greater CSU contribution, the projects are those properly the responsibility of local agencies and utilities, ... Because implementation of regional mitigation is the responsibility of another agency, and is currently disputed, mitigation of the impact to a less than significant level cannot be assured by CSU." (Italics added.) Nevertheless, the Trustees concede in this finding, "[The University] will contribute fees as mandated by applicable provisions of Government Code Section 5-999 to mitigate its share of the impact." (Italics added)
The Trustees made the following finding with respect to traffic and circulation, and a similar finding with respect to public services, specifically the addition of a fire station, neither of which CSU (California State University) concedes are subject to Government Code section 54999:
"The Board of Trustees finds that the specific measure to mitigate this impact to a level of insignificance is to implement the planned regional FORA transportation improvements, as identified in the FORA Reuse Plan and accompanying documents. Implementation of the planned regional improvements are [sic] within the responsibility of FORA (not the university). FORA can and should implement these measures. Because implementation of the regional mitigation is currently disputed among the responsible agencies, mitigation of the impact to a less than significant level cannot be assured by CSU. It is hereby determined that any remaining unavoidable impacts are acceptable for the reasons specified in the Statement of Overriding Considerations. The Board of Trustees adopts those measures listed as Mitigation 1, 2, and 3 which are not identified as the responsibility of another agency."
No commitment is made to help pay for these facilities pursuant to Government Code section 54999. The Trustees also made various findings with regard to mitigation measures the University would take.
These findings are supported in the record. More importantly, if the Trustees are to be consistent in its legal interpretation of the University's constitutional responsibilities, it had little other logical choice but to adopt findings along these lines.
The issue is the University's funding of off-site facilities constructed by others, not whether the University will itself construct off-site mitigation facilities. The University has no more jurisdiction to construct improvements off its land than it does to go onto a city street or any other property it does not own and begin to construct road improvements, fire stations, or water *824 and sewage plants. It is not questioned that FORA had responsibility to plan and construct the improvements not on the campus proper. In any event, the University could not do so. Moreover, off-campus improvements would be directed at the impact of replacing some 31,000 Fort Ord residents with the movements of 25,000 students intermingled with other uses that FORA plans for the surrounding area. This would be a concern for FORA's planning, not the University's planning. The question, in any event, is whether the University must pay for such capital improvements that FORA had planned.
The issue is properly conceived as a funding issue, then, not an issue of identifying environmental impacts under CEQA. The legal question is whether the University's funds are subject to use for off-campus infrastructure improvements. The trustees strongly contend that they are not.
The primary case in this area is San Marcos, supra, 42 Cal.3d 154, 228 Cal. Rptr. 47, 720 P.2d 935, an essentially unanimous decision written by Justice Lucas.[5] The San Marcos decision was so important to the budgetary workings of the State, that the Legislature directly cites and modifies the decision in Government Code section 54999.
The reasoning and precedent for the San Marcos decision is important for untying the knot presently before the court. San Marcos explained that under Article XIII, section 3, subdivision (b) of the California Constitution, property owned by public entities such as a public school district is exempt from property taxation, and courts have long held that such property is likewise impliedly exempt from "`special assessments.'" (San Marcos, supra, 42 Cal.3d at pp. 160-161, 228 Cal.Rptr. 47, 720 P.2d 935, citing Inglewood v. County of Los Angeles (1929) 207 Cal. 697, 703-704, 280 P. 360.) "The rationale behind a public entity's exemption from property taxes and special assessments is to prevent one tax-supported entity from siphoning tax money from another such entity; the end result of such a process could be unnecessary administrative costs and no actual gain in tax revenues. [Citation.]" (San Marcos, supra, 42 Cal.3d at p. 162, 228 Cal.Rptr. 47, 720 P.2d 935.)
The San Marcos court was faced with an argument, however, that the sewage charge to the school district had been a "user fee" not an assessment. (San Marcos, supra, 42 Cal.3d at p. 160, 228 Cal. Rptr. 47, 720 P.2d 935.) While reaffirming that, "when one tax-supported entity provides goods or services to another, neither the California Constitution nor decisional law exempts the public entity from paying for these goods or services," (id. at p. 161, 228 Cal.Rptr. 47, 720 P.2d 935) the Court found the sewage charges in question not to be such a good or service. In doing so, the Court relied on cases involving a public university campus. (Regents I, supra, 100 Cal.App.3d 547, 160 Cal.Rptr. 925; Regents II, supra, 148 Cal.App.3d 451, 196 Cal.Rptr. 14.) Regents I and Regents II are, of course, particularly applicable here, where a university campus is also at issue.
As explained in San Marcos, in Regents I the Regents of the University of California challenged a "`sewage facilities charge'" imposed by the City of Los Angeles on all users of the city sewer system. *825 The Regents did not dispute a "connection" charge and a monthly "service" charge that were also imposed on the University campus, just the "facilities" charge. The court stated that, "although the amount of the `sewage facilities charge' is based upon anticipated use of the sewer system by the user, the collected revenues are not used to defray the costs of providing sewer service to the users.... Rather, the revenues collected as a result of the 'sewage facilities charge' are used by the city to provide capital for sewer construction, i.e. to finance local improvements. Such a charge for capital funding is little more than a disguised special assessment. [Citation.]" (Regents I, supra, 100 Cal. App.3d at pp. 549-550, 160 Cal.Rptr. 925.) Following Regents I, the City of Los Angeles amended its municipal code to increase its sewer "service" charge. The new charge included a portion for capital funding and was based on actual rather than anticipated use. The Regents refused to pay the new portion of the service charge earmarked for capital improvements. The court in Regents II, supra, 148 Cal.App.3d 451, 196 Cal.Rptr. 14, rejected the city's argument that this new charge differed from the one in Regents I because it was based on actual use. The court held that "The ... test is the purpose of the disputed charge." (Id. at p. 455, 196 Cal.Rptr. 14.)
The Regents of the University of California also appeared in San Marcos as amicus curiae. The Court separately took note of the Regents' argument, that charges necessary to fund local capital improvements would reduce the resources that the school may use to perform its other functions. (San Marcos, supra, 42 Cal.3d at p. 163, 228 Cal.Rptr. 47, 720 P.2d 935.)
These arguments, which carried the day in San Marcos, are precisely those employed by the Trustees here. In essence, the Trustees claim that the business of the University is education and on-campus facilities. Under the budgeting laws of the State, including the gloss on such law found in the San Marcos opinion itself, the University's funding from the State is to pursue its function, and not financing of other public facilities.
The holding in San Marcos, was, as indicated, partially abrogated in adoption of Government Code section 54999, which states as follows:
"Section 54999 .... [¶] (a) The Legislature finds and declares that many public entities that provide public utility service have imposed capital facilities fees applicable to users of public utility facilities in order to equitably apportion the cost of capital facilities construction or expansion required by all public and private users of the facilities. In the recent decision in San Marcos Water Dist. v. San Marcos Unified School Dist., 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935, the California Supreme Court held that public entities cannot be made subject to these fees without statutory authorization. As a result, the fiscal stability and service capabilities of the affected public utility service agencies which have in good faith collected and spent these fees for capital improvements are seriously impaired as is the ability to finance essential future facilities. [¶] (b) The Legislature further finds that the holding in the San Marcos Water Dist. v. San Marcos Unified School Dist., 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935, should be revised to authorize payment and collection of capital facilities fees subject to the limitations set forth in this chapter, and in furtherance of this finding the Legislature hereby enacts the following provisions." (Gov.Code, § 54999.)
Government Code section 54999.1, subdivision (d) goes on to define "`Public utility facility'" to mean "a facility for the *826 provision of water, light, heat, communications, power, or garbage service, for flood control, drainage or sanitary purposes, or for sewage collection, treatment, or disposal," and defines "`Public utility service'" to mean "service provided from a public utilities facility." (Gov.Code, § 54999.1, subds.(d) & (e).) The University does not find "traffic" or "fire safety" facilities in that list. The University thus contends that the San Marcos decision, which rejected assessments between public agencies, was not abrogated as to traffic and fire safety facilities. Therefore, the University reasons, it cannot and should not be assessed for these latter sorts of facilities.
Even as to public utility facilities, however, the burden is on FORA to justify the fees. The Supreme Court recently explained this area of the law in Utility Cost Management v. Indian Wells Valley Water Dist. (2001) 26 Cal.4th 1185, 114 Cal. Rptr.2d 459, 36 P.3d 2: "In response to our decision in San Marcos ..., the Legislature adopted the `San Marcos Legislation,' providing the authorization for special assessments that we found lacking in that case. ([Gov.Code,] §§ 54999-54999.6; Stats.1988, ch. 53, § 1, p. 310.) [Government Code] [s]ection 54999.2 authorizes public utilities to impose a `capital facilities fee' on public entities `except as provided in Section 54999.3,' and section 54999.1 defines a `"capital facilities fee"' as `any nondiscriminatory charge to pay the capital cost of a public utility facility.' ... [Citation.] ... [Citation.] In addition, upon request (or in the event of an increase in the fee), the public utility must 'identify the amount of the capital facilities fee' and 'has the burden of producing evidence to establish [the propriety of] the ...fee.' ([Gov.Code,] § 54999.3, subd. (c).)" (Id. at pp. 1189-1190, 114 Cal. Rptr.2d 459, 36 P.3d 2, italics added.)
To the extent that the University's sovereignty over its funding and mission have been abrogated by Government Code section 54999 et seq, however, the University is willing to concede that it must go through the process provided in those statutes, for determining its proportional share of those public utility facilities listed. The University is not willing to go further. It contends that it simply cannot fund other improvements under existing law without making an illegal gift of public funds.
In its statement of decision the trial court said: "Although most, if not all, of the surrounding communities strongly supported the location of a university campus on this site, those same communities now contend that the TRUSTEES have taken positions contrary to earlier representations. These communities in their comments to the EIR and in this lawsuit maintain that [the University] has now refused to take responsibility to mitigate the significant environmental impacts that will be caused by [the University], leaving the financial burden to be borne by these communities ...." These considerations in the trial court's decision are made irrelevant by the San Marcos opinion. In San Marcos, the court stated: "Our conclusion does not mean that the water district cannot collect money for capital improvements from its customers; it simply means that the private customers will pay the entire cost of capital improvements. Public entities, such as the school district, will not be required to allocate their limited tax revenues to pay for capital improvements built by the sewer district." (San Marcos, supra, 42 Cal.3d at p. 158, 228 Cal.Rptr. 47, 720 P.2d 935.)
The San Marcos opinion also held that the public schools could not be compelled to pay for such improvements by theories of contract or promissory estoppel, *827 which are implied in the trial court's summary of the city's position that the "communities now contend that the TRUSTEES have taken positions contrary to earlier representations." Even if the University had represented, promised or contracted with FORA to pay such charges, as the trial court implied in its decision, the University still could not pay them or be sued for them. As the court in San Marcos quotes and reiterates, from County of Riverside v. Idyllwild County Water Dist. (1978) 84 Cal.App.3d 655, 659, 148 Cal.Rptr. 650 (Riverside) "`whether the [school district] can agree to pay the charge depends upon whether the [water] district has the power to impose it.' Because the water district does not have the power to impose the capacity fee here, if the school district pays the invalid charge it would amount to a `gift of public funds in contravention of article XVI, section 6 of the California Constitution.' [Citation.]" (San Marcos, supra, 42 Cal.3d at p. 167, 228 Cal.Rptr. 47, 720 P.2d 935.)
Thus, this state's constitutional and statutory framework compel the conclusion that off-site improvements in traffic facilities necessary to handle the loads put on them by a public university are not the responsibility of that university but rather of the locality. Fire protections, unlike offsite traffic facilities which clearly are not on the University's land, could be provided by putting a fire station on the campus itself. The Trustees found, however, that the impact would be mitigated by the fire protection improvements already "identified in the FORA Reuse Plan." In any case, as was their right, the Trustees "determined that any remaining unavoidable impacts are acceptable for the reasons specified in the Statement of Overriding Considerations."
The statement of overriding considerations adopted by the Trustees encompasses, what the trial court referred to below as the reasons why "the surrounding communities strongly supported the location of a university campus on this site." Although these overriding considerations also allude to general goals of the Trustees and state to provide postsecondary education, many of them concern local revitalization and local educational, community and job needs. Many of the communities responding to the draft EIR in the record betray a desire, on the one hand, to recognize the benefits of having the University locate on the site but, on the other hand, to obtain funding and infrastructure concessions.
Such state funding mechanisms in their statutory and constitutional context do not make such conflicting goals addressable through the CEQA environmental review process. While the state could have set up a different budgetary framework, in which schools were subject to assessment for offsite traffic and fire safety improvements, clearly, the Legislature allocates money in reference to the structure set up by the San Marcos decision and Government Code sections 54999 et seq. The statutes establishing FORA specifically mentions "[Government Code] [s]ection 54999." (Gov.Code, § 67685.) Moreover, "[t]he Legislature `is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted ... a statute in light thereof.'" (People v. McGuire (1993) 14 Cal.App.4th 687, 694, 18 Cal.Rptr.2d 12.)
CEQA's procedures clearly permit a lead agency to determine that overriding considerations require approval of the project. (Pub. Resources Code, § 21081.) It is worth emphasizing again, however, that the challenge that petitioners FORA and the City of Marina make to the resolution of the Trustees here does not implicate a difference in goals concerning the natural environment. Moreover, there do not *828 seem to be major disagreements over the type of physical facilities required to deal with the traffic, fire safety and other issues created by the University, which exist in FORA's own plans. The challenge here is not that the Trustees failed to identify or analyze significant environmental impacts or identify the facilities necessary to mitigate them, which would be a claim under CEQA. The dispute is rather about who will fund construction of such facilities.
Locating a public university at the site was highly desirable to the City of Marina, and other communities making up FORA. But its location came with costs. Although the University will be spending large amounts of money on campus, with a large payroll and other social and cultural benefits to the communities, which are identified as "overriding considerations" in the Trustees' resolutions, these communities inherit the legal and budgetary structure within which such institutions operate. Part of that concerns the University's contribution to off-site improvements. The decision of the Supreme Court in San Marcos, supra, 42 Cal.3d 154, 228 Cal. Rptr. 47, 720 P.2d 935, did not create but merely upheld a long history under which it has been held that fee assessment for off-site capital improvements against a public school violates the Constitution. The Legislature, in partially abrogating the San Marcos decision in Government Code section 54999 et seq., specified the precise sorts of "utilities" for which assessments can be made against such a school. The Trustees, as part of the findings approving the CMP do commit to undergoing the process under those Government Code sections, for assessing the fees for their proportionate use of those facilities that are defined as "utilities" under the statute. The CMP refuses to commit to such an assessment for other facilities.
The Legislature has drawn the applicable line. The University is free behind this line to use its budgetary authority only for its own mission, of constructing the campus, providing educational services and paying assessments for those "utilities" specified in sections 54999 et seq. Needless to say, the Legislature sets in large part the budget of the University. The Legislature is also capable, through the influence of legislators from districts affected by university campuses, of allocating those funds to traffic or fire safety projects in areas surrounding such campuses, even if it means subtracting funding from the university's budget. If it is the will of the majority of legislators and their constituents that state funds be reallocated away from the University's mission, to mitigating such traffic and fire impacts, then the Legislature can accomplish this by simply passing legislation to fund such items and defunding the University to that extent. It is to the Legislature, with its plenary power over the budget, and not to the courts, that the pleas of the City of Marina and FORA should be addressed. FORA and the City of Marina, in bringing this writ action, attempt to have the court reorder the budgetary authority that the Legislature has enacted. They seek to have the appropriations to the University devoted to building off-campus roads and fire stations rather than to the purposes for which the Legislature understood the money was to go under established precedent that such money was not subject to assessments for off-campus capital improvements.
Under separation of powers doctrines, the courts are not generally permitted to order Legislative appropriations or order that appropriations be used for other purposes other than that specified. "Further, an administrative agency is subject to the legislative power of the purse and `may spend no more money to *829 provide services than the Legislature has appropriated.' [Citation.] The power of appropriation includes the power to withhold appropriations. Neither an executive administrative agency nor a court has the power to require the Legislature to appropriate money. [Citation.]" (Carmel Valley Fire Protection Dist. v. State of California (2001) 25 Cal.4th 287, 300, 105 Cal. Rptr.2d 636, 20 P.3d 533; see also, Mandel v. Myers (1981) 29 Cal.3d 531, 551, fn. 9, 174 Cal.Rptr. 841, 629 P.2d 935; Serrano v. Priest (1976) 18 Cal.3d 728, 751, 135 Cal.Rptr. 345, 557 P.2d 929; Hicks v. Board of Supervisors (1977) 69 Cal.App.3d 228, 235, 138 Cal.Rptr. 101.)
The FORA Act indicates that FORA is to obtain financing for improvements from establishing financing districts with assessments, bonds and special taxes. (See, e.g., Gov.Code, §§ 67679, 67679.5, 67691, 67692, 67695.)[6] Within these statutes forming FORA, there is explicit recognition that the University's contribution to capital facilities fees is subject to the provisions of Government Code section 54999. (Gov.Code, § 67685.)[7]
*830 In fact, the City of Marina's and FORA's challenge to the University's action here may fundamentally misconceive the nature of the planning documents that the Trustees have approved. The resolutions do not compel FORA or the City of Marina to fund improvements. Indeed, the EIR and its findings expressly recognize this. The documents state that the University cannot assure mitigation because it cannot assure that FORA will construct the needed improvements, even as to facilities to which the University will contribute, and that the University cannot control FORA's actions or ensure that others will contribute. The University is merely stating facts and findings in this document. It is projecting over a 30-year time horizon for planning purposes, and drawing the lines where it believes the law presently requires them to be. Certainly, during those 30 years, FORA, the city and the University will have to cooperate at many points and over many issues. Conceivably, university administrators may use their influence with the Legislature to enable surrounding communities to the campus to obtain the funds necessary to construct traffic or fire facilities. That is different, however, from the University obligating itself in this planning document to make what it understands to be illegal "gifts of public funds" or to stray from its educational mission and budgetary structure, which the Legislature, the Constitution and court decisions have imposed for its funding. Put another way, a commitment by the University to fund offsite capital improvements could lead to legal challenges to such expenditures as illegal "gifts." (Cf, Edgemont Community Service Dist. v. City of Moreno Valley (1995) 36 Cal.App.4th 1157, 1165, 42 Cal.Rptr.2d 823; White v. State of California (2001) 88 Cal.App.4th 298, 105 Cal.Rptr.2d 714 [taxpayer sues for alleged gift of public funds]; City of Ontario v. Superior Court (1970) 2 Cal.3d 335, 85 Cal.Rptr. 149, 466 P.2d 693 [same].)

DISPOSITION
The judgment is reversed as to those portions of the trial court's judgment that (1) require the Trustees to set aside their approval of the EIR and master plan if the Trustees do not adopt mitigation findings in accordance with the judgment and (2) order the Trustees to set aside the adopted statement of overriding consideration (Section 1, subsection (a) and (b) of the judgment). Appellant shall have their costs.
I CONCUR: MIHARA, J.
BAMATTRE-MANOUKIAN, J., Dissenting.
The California Environmental Quality Act (CEQA) reflects important statewide policy ensuring that protection of the environment "shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001, subd. (d).) CEQA contains a "substantive mandate" requiring public agencies to refrain from approving projects with significant environmental effects if "there are feasible alternatives or mitigation measures" that can substantially lessen or avoid those effects. (Mountain Lion Foundation v. Fish and Game Commission (1997) 16 Cal.4th 105, 134, 65 Cal. Rptr.2d 580, 939 P.2d 1280; Pub. Resources Code, § 21002.)
*831 California State University (CSU) is not exempt from CEQA due to its status as a state university. Public agencies carrying out projects are "subject to the same level of review and consideration ... as that of private projects required to be approved by public agencies." (Pub. Resources Code, § 21001.1; see, e.g., Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 253 Cal.Rptr. 426, 764 P.2d 278.) State universities are expressly included within CEQA's coverage. (Pub. Resources Code, § 21080.09, subd. (b).) Thus nothing in CEQA relieves a university such as CSU from its duty to mitigate, where feasible, identified significant environmental impacts caused by its project: "Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (Pub. Resources Code, § 21002.1, subd. (b).)
I believe the context of this case as a CEQA proceeding distinguishes it from San Marcos Water Dist. v. San Marcos Unified School Dist. (1986) 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935 (San Marcos ), as well as from the Regents cases (Regents of University of California v. City of Los Angeles (1979) 100 Cal.App.3d 547, 160 Cal.Rptr. 925; Regents of University of California v. City of Los Angeles (1983) 148 Cal.App.3d 451, 196 Cal.Rptr. 14.) In San Marcos, the Supreme Court found that a public utility may not levy special assessments on property owned by a public school district to pay for the utility's construction of capital improvements. Such special assessments on property owned by state or local government are prohibited under the California Constitution. (Cal. Const., art. XIII, § 3.) In San Marcos, however, the school district was not subject to the provisions of CEQA. Furthermore, unlike San Marcos and the Regents cases, the case before us is not a case where the public utility or utility district is seeking to impose a fee or assessment on the public entity property owner in order to pay the costs of expanding its facilities. Rather it is CSU's project that has created the impact on the environment and the consequent need for the expanded infrastructure. In such a case, CEQA's requirements to identify impacts and to provide mitigation where feasible are brought into play. Furthermore, unlike a property owner made subject to a special assessment, a property owner proposing a project can include funding for mitigation as part of the project's capital cost. (See, e.g., Loyola Marymount University v. Los Angeles Unified School Dist. (1996) 45 Cal.App.4th 1256, 1267, 53 Cal.Rptr.2d 424, making a similar distinction between an ad valorem tax, which is a compulsory assessment on all property to pay for general improvements, and a development fee, which is "imposed only if a property owner elects to develop.") I believe the law is clear that CEQA imposes an independent duty upon any project proponent, including a state university, to mitigate the impacts of its project. I therefore do not agree that CSU's mitigation of impacts in accordance with CEQA requirements is constitutionally prohibited as a special assessment on public property under San Marcos.
CSU's legal obligations under CEQA are not, in my view, altered by the presence of the Fort Ord Reuse Authority (FORA) as the agency responsible for coordinating and implementing the improvement programs that will ultimately provide the mitigation required of CSU. The Fort Ord Reuse Act (Gov.Code, § 67650 et seq.) reflects that the Legislature was aware of the regional impacts that would accompany the redevelopment of the entire base property and was concerned about the need for a coordinated effort to carry out programs to mitigate those impacts. The statutes comprising the Act clearly contemplate *832 that CSU, as the principal base reuse participant, will contribute towards the construction of the infrastructure necessitated by its development on the base property. CEQA requires that "all state agencies, boards, and commissions ... request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities." (Pub. Resources Code, § 21106.) If those problems can be addressed effectively through a local multi-agency improvement program such as FORA's, I see no reason why the state agency cannot constitutionally contribute to such a program in order to discharge its mitigation duties under CEQA.
The EIR for CSU's master plan identified several significant off-campus impacts attributable to the CSU project that would require infrastructure improvements to mitigate the impacts to a less than significant level. The four pertinent areas of impact here are water, sewer, traffic and fire protection. CSU's infeasibility findings regarding these impacts were based on the assertion that FORA was the agency with the responsibility for implementing the regional infrastructure improvements that would reduce the impacts to a less than significant level. CSU thus found that FORA "can and should" implement such mitigation measures and therefore it was infeasible for CSU to do so. (Pub. Resources Code, § 21081, subd. (a)(2).) However, although FORA has jurisdiction to implement and to oversee the proposed infrastructure improvement program, this does not absolve CSU of its duty under CEQA to mitigate by contributing its fair share to FORA's infrastructure improvement program. This participation was contemplated by the FORA legislation and is mandated under CEQA law. Thus, the presence of FORA does not render mitigation infeasible, as CSU found. To the contrary, FORA provides a feasible means for CSU to mitigate the impacts of its project.
This court and others have found that contributions by a project proponent to similar infrastructure programs for off-site improvements constitute adequate mitigation measures under CEQA. (Save Our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 140, 104 Cal.Rptr.2d 326; Russ Bldg, Partnership v. City and County of San Francisco (1988) 44 Cal.3d 839, 845, 244 Cal.Rptr. 682, 750 P.2d 324; San Franciscans for Reasonable Growth v. City and County of San Francisco (1989) 209 Cal. App.3d 1502, 258 Cal.Rptr. 267.) Indeed the Guidelines provide that a project's contribution to a cumulative impact may be mitigated by requiring the project "to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact." (Guidelines, § 15130, subd. (a)(3).) Of course no one expects CSU itself to construct the road improvements or fire stations, as the majority opinion points out. Nor does CEQA require that CSU guarantee that the improvements will be completed. So long as there is a "reasonable plan for mitigation" and contributions are "sufficiently tied to the actual mitigation" of the project's impacts, a commitment by the project proponent to contribute a fair share to such a program discharges its mitigation duty under CEQA. (Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th at p. 141, 104 Cal.Rptr.2d 326.)
CSU concedes that the Government Code expressly authorizes it to pay certain costs towards public facilities improvements specifically enumerated in section 54999.1, which include water and sewer. CSU committed itself to "contribute fees as mandated by applicable provisions of Government Code Section 54999 to mitigate *833 its share of the impact." As to traffic and fire protection, however, CSU made no commitment to contribute to FORA's program for providing the facilities that would mitigate these impacts. The majority opinion concludes that CSU could legally do no more than this, and that FORA must find other sources for funding the needed improvements.
I respectfully disagree. A central purpose of FORA is to plan and implement the improvements that will be necessary to mitigate the impacts of redevelopment of the base property. (Gov.Code, § 67675.) This purpose would be undermined if CSU, which was envisioned by the Legislature as the principal participant in the base reuse plan, were exempt from contribution to the FORA improvement program. Under the circumstances, I believe that CSU's findings, that it was not feasible to mitigate the impacts of its project because it was FORA's responsibility to do so, were legally inadequate. I further believe, however, that any contributions that CSU is required to make to FORA must be shown to be necessary to mitigate the impacts resulting from CSU's project. The Guidelines provide that such fair share mitigation measures must be consistent with constitutional principles governing "takings." Thus a nexus must be shown and the mitigation must be proportional to the impacts attributable to the project. (Guidelines, §§ 15130, subd. (a)(3); 15126.4, subd. (a)(4).)
At the time the CSU master plan was approved, the Base Reuse Plan did not yet contain a detailed financing plan consistent with these principles and specifically tailored to providing mitigation of the particular impacts identified here. It provided only a general plan and a rough allocation of shares among base reuse participants. Although the exact extent of CSU's contribution to FORA for regional infrastructure improvements attributable to its project had not yet been determined at the time the campus master plan was developed, I do not believe that this circumstance supports a finding that mitigation was not feasible. At the very least CSU must indicate a commitment to contribute its share of mitigation expenses when a plan is implemented that meets the nexus and proportionality requirements, or in the alternative when FORA implements a financing mechanism applicable to state agencies under the authority granted to it by the Legislature. (Gov.Code, § 67679, subd. (d).)
In sum, I agree with the trial court's finding that "read together, the statutes creating FORA and CEQA reflect a legislative intent for CSU to participate in the funding of any public capital facilities caused by (i.e., with a nexus to) the CMP for [the University], limited to it's [sic ] proportionate share and further limited only by the constraints of Gov.Code Chapter 13.7 with respect to certain specific types of utility fees.... CSU's responsibility is to fund its proportionate share consistent with its phased development into a fund earmarked only for the mitigation of those impacts. This is a responsibility no greater or less than that imposed by CEQA on any other project proponent."
I would therefore conclude that CSU's findings that it could not feasibly mitigate impacts on water, sewer, traffic and fire protection were legally inadequate. Thus CSU's approval of the campus master plan on the basis of such findings constituted an abuse of discretion. (Pub. Resources Code, § 21168.5; Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th at p. 118, 104 Cal.Rptr.2d 326.) I believe that both CEQA and the Fort Ord Reuse Act require that CSU modify its findings by including a commitment to pay its fair share to mitigate the impacts caused by its *834 project by contributing to FORA's improvement plan, provided that a financing program is in effect that conforms to the constitutional principles of proportionality and nexus. With that modification I would find that the EIR is otherwise legally adequate and supported by the record.
NOTES
[1] Public Resources Code section 21000 et seq.
[2] One FTE is equal to one student enrolled in 15 units or three part-time students enrolled in five units each.
[3] Alternatives were considered as mandated by CEQA, including the No Project Alternative and a Reduced Project Size/Reduced Auxiliary Alternative.
[4] Public Resources Code section 21081 provides: "[N]o public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

(a) The public agency makes one or more of the following findings with respect to each significant effect:
(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.
(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.
(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.
(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (Pub. Resources Code, § 21081, italics added)
[5] In San Marcos, the concurring opinion of Grodin, J., joined by Bird, C.J., noted that the rule it reiterated seemed artificial but the subject of "well-established" precedent, and invited "the Legislature, if it sees fit, to establish a different rule." (San Marcos, supra, 42 Cal.3d at pp. 168-169, 228 Cal.Rptr. 47, 720 P.2d 935 (cone. opn. of Grodin, J.).) The Legislature then did modify the rule. References to the "San Marcos opinion" are to the opinion of Justice Lucas to which there was no actual dissent.
[6] FORA argues that these statutes evince a plan by the Legislature to abrogate the immunity of the University from assessments. The funding mechanisms in these statutes are no different, however, from the funding mechanisms for other districts established to improve streets, fire safety, or other public facilities by bonds and assessments. In fact, such other funding mechanisms, contained in other statutes, are listed as a means by which FORA can raise funds for its responsibilities. (Gov. Code, § 67679, subd. (d)(1), (2), (6) & (7).) FORA's argument proves too much. It implies that all funding mechanisms set up or permitted by statute abrogate the immunity of the University from assessments. The San Marcos decision was clearly made concerning just such a funding mechanism authorized by statute, and it held that such a district cannot levy against a public school assessments for capital improvements. FORA also argued for the first time in a supplemental brief that the Mello-Roos Community Facilities Act was amended in 1994 such that a "public agency is not a landowner or owner of land for purposes of this chapter, . . . unless the land owned by the public agency is within the territory of a military base that is closed or is being closed." (Gov.Code, § 53317, subd. (f).) The Mello-Roos Community Facilities Act is mentioned as one funding mechanism that can be used by FORA in subdivision (d)(7) of Government Code section 67679. This is a somewhat different and more specialized question than that raised below or in the original appeal, which was whether FORA itself can impose an assessment on the University for capital facilities. The case is not presented here, nor ripe, of a Mello-Roos district having actually been formed and the district having imposed a "special tax" by vote of two-thirds of the qualified electors of the proposed facilities district subject to the levy. (Gov.Code, §§ 53326, 53328.) Moreover, the words "landowner" and owner of land have specialized application under the Mello-Roos Community Facilities Act which bestows rights rather than solely making such person or their property subject to tax. (Gov. Code, §§ 53321, subds.(d), 53322.4, 53326, subds. (a), (b) & (c), 53327.5.) Such a special tax has not been the subject of this appeal. We do not prejudge the conclusion that would be reached in such a case, were it presented on that narrow question.
[7] We acknowledge that Government Code section 54999 et seq., appears to authorize capital assessments to be made for public utilities rather than specifically prohibiting other capital assessments. Government Code section 54999 refers itself, however, to San Marcos, supra, 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935. It is thus clear that the Legislature understood that assessments against school property for capital improvements were prohibited by existing precedent except for those it was authorizing by Government Code section 54999 et seq. Therefore, while reference to Government Code section 54999 in Government Code section 67685 is not wholly conclusive as a matter of logic, because Government Code section 54999 is not prohibitory, the Legislature's budgetary analysts would understand that funding of the University was not to be diverted to off-site capital improvements other than the public utilities specified in Government Code section 54999 et seq. In San Marcos, the concurring opinion of Grodin, J., joined by Bird, C.J., noted that the rule seemed artificial but the subject of "well-established" precedent, and invited "the Legislature, if it sees fit, to establish a different rule." (San Marcos, supra, 42 Cal.3d at pp. 168-169, 228 Cal.Rptr. 47, 720 P.2d 935.) Similarly, here, the petitioners can put their case before the Legislature for including traffic and fire safety assessments among the list of "Public utility facilities" defined in Government Code section 54999.1, subdivision (d).